EL PUEBLO DE PUERTO RICO, apelado, *v.* VÍCTOR ORTIZ GONZÁLEZ, acusado y apelante.

*Número:* CR-80-21    *Resuelto:* 26 de junio de 1981

*José Rafael Gelpí* y *Sergio A. Peña Clos*, abogados del apelante; *Héctor A. Colón Cruz, Procurador General,* y *Lorraine Riefkohl, Procuradora General Auxiliar*, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

El apelante ultimó a José Luis Molina de dos tiros. Fue acusado de asesinato en primer grado y de infracción de los Arts. 6 y 8 de la Ley de Armas. Fue hallado culpable de asesinato en segundo grado y de infracción de los citados artículos de la Ley de Armas.

El apelante apunta cinco errores. Todos relacionados con las instrucciones impartidas al jurado. En su primer apuntamiento el apelante plantea que "[e]l tribunal erró al instruir que homicidio era dar muerte ilegal a un ser humano sin que medie malicia, lo que no es correcto desde la vigencia del Código Penal de 1974, bastando con que la

muerte haya ocurrido en ocasión de una súbita pendencia o de un arrebato de cólera". Alega el apelante que como de la tipificación de los delitos de asesinato y homicidio se eliminó en el Código Penal de 1974 el adjetivo "ilegal", la instrucción es errónea por cuanto utilizó el término "muerte ilegal" en las ocasiones en que el tribunal definió los delitos de asesinato y homicidio. En consecuencia, afirma el apelante, el jurado pudo confundirse.

El apelante sostiene que la instrucción presume que todo homicidio es ilegal, a pesar de que, a partir de 1974, homicidio no es dar muerte ilegal a un ser humano, sino darle muerte con motivo de un arrebato de cólera o súbita pendencia. La distinción es errónea.

▄▄▄▄ Antes que nada, debemos señalar que el apelante no objetó ninguna de las instrucciones, razón por la cual no puede objetarlas por primera vez en apelación. *Pueblo* v. *Velázquez Caraballo*, 110 D.P.R. 369 (1980). Además, las instrucciones fueron leídas textualmente de las páginas del Manual de *Instrucciones al Jurado para el Tribunal Superior de Puerto Rico*. A dichas instrucciones las cobija una presunción de corrección (Resolución de 7 de mayo de 1976, 104 D.P.R. 1067), que no puede ser impugnada en ausencia de una demostración real de que, en efecto, la instrucción es errónea. En este caso no lo es.

▄▄▄▄ La eliminación del adjetivo "ilegal" no tiene ninguna consecuencia jurídica, pues, como señala el comentario al pie del Art. 82 del Código Penal, Ed. Colegio Abogados, "[l]a frase 'muerte ilegal' es sustituida por 'muerte' ya que resulta redundante y se presta a confusión. Véase, *Pueblo* v. *Díaz*, 35 D.P.R. 582 (1926)". Esto no quiere decir que a partir de 1974 homicidio no es matar ilegalmente a un ser humano. Tanto en el homicidio como en el asesinato la muerte es producida ilegalmente. La diferencia es que, cuando la muerte es resultado de un arrebato de cólera o súbita pendencia, la calificación del delito y la pena varían en beneficio del actor. Ni la súbita pendencia ni el arre-

bato de cólera son causas de exclusión de responsabilidad penal. Véase: Arts. 18 al 25 del Código Penal, 33 L.P.R.A. secs. 3091–3098. Una instrucción que constituye una exposición correcta del derecho no pudo haber perjudicado al apelante por el solo hecho de que la instrucción no siguió fielmente el nuevo texto de la Ley. *Cf. Pueblo* v. *Reyes Lara,* 100 D.P.R. 676, 690 (1972).

El segundo apuntamiento es igualmente inmeritorio. Plantea el apelante que "[e]l tribunal erró al no instruir específicamente que de no creer el jurado la prueba de peligro real tendente a una absolución presentada por la defensa, ha debido considerar la prueba de peligro aparente presentada por El Pueblo y absolver al acusado".

Alega el apelante que la prueba de cargo incluyó el testimonio del señor Carmelo Bastián, testigo renunciado por la defensa, quien declaró que oyó al occiso proferir insultos al apelante y que también vio salir al occiso en posición de acecho de detrás de una camioneta con un objeto en la mano en el preciso momento en que el apelante le disparó dos veces. El apelante sostiene que de dicho testimonio puede inferirse que el apelante actuó en defensa propia porque estimó que su vida realmente peligraba, mientras que la prueba de defensa tendió a demostrar que el apelante actuó bajo la creencia razonable de que su vida corría peligro.

A base de lo anterior, el apelante afirma que las instrucciones sobre defensa propia debieron ser más específicas en cuanto a la distinción entre el peligro aparente y el peligro real. No estamos de acuerdo.

Nuevamente tenemos que señalar que la instrucción sobre defensa propia impartida fue leída del citado Manual de Instrucciones. La misma es correcta y, además, suficiente. Por otro lado, debemos añadir que el apelante nunca solicitó instrucciones específicas en ese sentido. Por lo tanto, como antes expresamos, no puede quejarse en apelación.

El apelante pone demasiado énfasis en el hecho de que uno de los testigos de cargo aportó los elementos de una defensa propia, mientras El Pueblo clamaba por un veredicto por asesinato. Lo cierto es que este hecho solo pudo favorecerlo, no perjudicarlo.

En su tercer señalamiento el apelante apunta que "[e]l tribunal erró al no instruir al jurado sobre los delitos en que podía traer veredictos de culpabilidad y ha debido instruir no en términos generales, y no [*sic*] en forma específica ilustrándolo con determinada prueba, expresando cuál era la que podía sostener uno u otro veredicto".

Hemos leído detenidamente la transcripción de las instrucciones impartidas y encontramos que las mismas son suficientes en derecho. Hubo instrucciones específicas sobre los posibles veredictos de: (1) culpable de asesinato en primer grado; (2) culpable de asesinato en segundo grado; (3) culpable de homicidio; (4) no culpable, y (5) no culpable por haber actuado en defensa propia. Con relación a la acusación por infracción del Art. 8 de la Ley de Armas, también se dieron las correspondientes instrucciones. El apelante a todos los efectos admitió su responsabilidad en los casos relacionados con la Ley de Armas, pues declaró "que el día 20 de marzo de 1979 en un almacén de madera del pueblo de Naguabo había encontrado un revólver y se lo había llevado para su casa; que el revólver estaba cargado y no se lo informó a la policía. . . . Admit[ió] que cometió una falta al no entregar el revólver a la policía inmediatamente".

Nuevamente repetimos que el apelante no solamente dejó de objetar las instrucciones impartidas, sino que tampoco solicitó instrucciones específicas. De todos modos, la juez sentenciadora no tenía la obligación de analizar toda la evidencia a la luz de las distintas exposiciones de derecho que componían las instrucciones al jurado. El hacerlo hubiese resultado en instrucciones innecesariamente ex-

tensas. En *Pueblo* v. *Velázquez Caraballo*, supra, pág. 374, dijimos:

> Consideramos buena práctica que las instrucciones al jurado no sean innecesariamente largas ni repetitivas, sino que se ajusten a la letra de la ley, a las instrucciones contenidas en el citado manual de *Instrucciones al Jurado* y que su lenguaje sea claro y directo. Una vez expresado claramente un concepto, su repetición e innecesaria elaboración puede producir confusión en la mente de los oyentes.

En su cuarto señalamiento de error, el apelante alega que "[e]l tribunal erró al instruir al jurado que las fotografías que fueron admitidas como prueba, lo fueron . . . con el propósito de ilustrar los móviles del delito".

Las fotografías a que se refiere el apelante mostraban el cadáver de José Luis Molina. Una de las fotografías mostraba al occiso con dos heridas de bala en la espalda. Afirma el apelante que las fotografías fueron admitidas no para demostrar móvil alguno, como dijo la juez, sino para demostrar la salida de plomos por la espalda, y que la instrucción tuvo el efecto de insinuar que el apelante atacó a su víctima por la espalda.

El apelante no ha transcrito la instrucción completa, sino que ha entresacado una frase aislada para sostener la incorrección de dicha instrucción. Ya expresamos en *Pueblo* v. *Domenech Meléndez*, 98 D.P.R. 64, 68 (1969), que "[h]ay que considerar las instrucciones en conjunto para determinar su corrección o incorrección". La instrucción impartida, leída del ya citado Manual de Instrucciones fue como sigue:

> Las fotografías de la víctima en este caso se admitieron únicamente con el propósito de ilustrarles a ustedes, Damas y Caballeros del Jurado, sobre el carácter y naturaleza de las heridas, los móviles del delito y la manera y el medio en que se ocasionó la muerte. Así como para demostrar la proximidad del acusado a la víctima al ocurrir la muerte.
>
> Con respecto a esta evidencia se les instruye que ustedes

no deben dejarse impresionar indebidamente por la misma y que deberán considerarla en relación con el testimonio del doctor Rafael Criado y los testigos que describieron los hechos; y que corresponde única y exclusivamente a ustedes darle a esa prueba la credibilidad o el valor probatorio que la misma merece. (T.E., pág. 15.)

El doctor Criado fue sumamente explícito al declarar que "de ninguna manera estos disparos [los que mataron a Molina] pudieron ser hechos estando el occiso de pie y la persona que disparó *detrás* del occiso" (énfasis nuestro) (E.N.P., pág. 6), y "que por el hecho de que se ha descrito la trayectoria de la bala mirando el cadáver de espalda *no quiere decir que los tiros fueron por la espalda*" (énfasis nuestro) (E.N.P., pág. 7).

■ Como se ve, el temor del apelante de que el jurado pudiera pensar que la referencia a móvil significaba muerte a traición, se desvanece. La fotografía fue admitida para el fin legítimo de ilustrar el testimonio del Dr. Criado, y como tal era admisible. *Pueblo* v. *González Colón*, 110 D.P.R. 812 (1981).

La referencia a móvil quedó subsanada con la parte final de la instrucción, que así lo aclara. No se cometió el error. De haberse cometido, el mismo no afectó derechos sustanciales del acusado. *Pueblo* v. *Cabrera Lozada*, 99 D.P.R. 689, 694 (1971).

Finalmente, señala el apelante que "[e]l tribunal erró al instruir que la defensa propia consistía en dar muerte a un ser humano cuando la vida de uno corría peligro inminente, bien sea real o aparente de muerte o de grave daño corporal, ya que no es necesario dar muerte".

La instrucción fue leída de la pág. 66 del citado Manual de Instrucciones que fue, en parte, la siguiente:

El acusado no está en obligación de probar la defensa propia más allá de duda razonable sencillamente porque si así fuera, se le estaría exigiendo que probase su inocencia y todo acusado, como antes ustedes han oído, se presume inocente hasta que se

le pruebe su culpabilidad. En consecuencia, bastará que la evidencia en apoyo de la defensa propia, considerada conjuntamente con toda la prueba, lleve a la mente de ustedes duda razonable de si el acusado actuó en defensa propia, para que exista el deber de darle el beneficio de esa duda al acusado y traer un veredicto de no culpable. (T.E., pág. 21.)

El apelante nos invita a que corrijamos el citado Manual de Instrucciones, porque la instrucción leída dice que supone que es al acusado a quien incumbe siempre presentar prueba de defensa propia, cuando lo cierto es que, como en este caso, la prueba de defensa propia puede surgir de la de cargo. Declinamos la invitación. La instrucción no se refiere al origen de la prueba, es decir, a quién corresponde presentarla. Meramente ordena al jurado que considere la prueba sobre defensa propia, la que sea, conjuntamente con toda la prueba presentada.

En este caso hubo prueba de defensa propia presentada por el apelante. Los elementos de defensa propia que pudo aportar la declaración de un testigo renunciado por la defensa, pero presentado por el fiscal, fueron debidamente considerados por el jurado, independientemente de la sutileza técnico-legal a la cual el apelante le atribuye carácter decisivo.

La defensa del apelante se basó en dos teorías: (1) defensa propia o, en su defecto, (2) homicidio. Para sustentar la defensa propia, el apelante descansó en cierta prueba que supuso al occiso atacándolo con un objeto en la mano; para el homicidio, invocó un ataque verbal de la víctima. Ninguna de las dos defensas prosperó ante el jurado.

La prueba de cargo estableció que José Luis Molina y el apelante habían tenido un incidente personal varios días antes, en el que Molina agredió físicamente al apelante y a su mujer e hija. El apelante se armó ilegalmente de un revólver y decidió resolver su asunto con Molina. Aparentemente la víctima usaba el alcohol con frecuencia y en ocasiones observaba conducta antisocial.

El día de los hechos la víctima se desmontó de un carro público que lo dejó frente al negocio del apelante. Cruzó para el negocio de un tal Félix Banrey, que queda enfrente, desde donde, según el apelante, comenzó a proferir insultos contra él. En adelante la prueba es conflictiva, pero la de cargo sostuvo que el apelante, al escuchar y ver a la víctima, buscó el revólver, salió afuera y comenzó a dispararle hasta que se acabaron las balas y el martillo del revólver daba en seco.

■ La notable provocación a que alude el apelante en una parte de su alegato como justificación para matar al occiso es que éste le dijo: "Mira canto de cabrón, tú quieres quitarme la herencia de la viejita." Alega el apelante que "[e]sas palabras dichas en Puerto Rico a un hombre casado... es una notable provocación y es una de las ofensas más grandes que puedan inferirse". (Alegato, pág. 19.) Falso. Las hay peores y, aun así, no se justifica que el agraviado le entre a tiros al vociferante. (1)

El concepto de la honra y el honor de una persona no se afecta con meros insultos de un alcohólico endeble. La muerte no estuvo justificada, aun si el jurado hubiera creído que hubo tal provocación.

La prueba de este caso apoya el veredicto rendido por el jurado, y en ausencia de manifiesto error, pasión, prejuicio o parcialidad no estamos autorizados a dejarlo sin efecto. *Pueblo* v. *Torres Montanez*, 106 D.P.R. 125, 130–31 (1977).

*Se confirmará la sentencia apelada.*

---

(1) Es interesante apuntar que la prueba de cargo le imputa al apelante haberle dicho "cabrón" a la víctima, en un incidente que tuvieron el 16 de marzo y que dio origen a la tragedia que terminó el 21 siguiente.