EL PUEBLO DE PUERTO RICO, apelado, *v.* JOSÉ LUIS LEBRÓN GONZÁLEZ, acusado y apelante.

*Número:* CR-80-45 *Resuelto:* 3 de junio de 1982

*Raymond Cátala Fonfrías*, abogado del apelante; *Justo Gorbea Varona, Procurador General Interino, Miguel A. Santana Bagur, Procurador General Auxiliar*, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

En el caso de autos, luego de una ponderada reflexión del proceso y las normas legales, sólo se hace cumplida justicia confirmando las sentencias apeladas. Así damos virtualidad al pensamiento moral, místico y jurídico de que "La justicia . . . es el único amigo que acompaña al hombre después de la muerte; todo lo demás perece con el cuerpo".[1]

El Ministerio Fiscal acusó a José Luis Lebrón González (c/p Tito Camaro) de asesinato en primer grado e infracciones de los Arts. 6[2] y 8 de la Ley de Armas, por la muerte de Jorge Rivera León el 12 de marzo de 1979, en la

---

[1] Citado por Alberto V. Fernández, *Función Creadora del Juez*, Buenos Aires, Ed. Abeledo-Perrot, 1970, pág. 9.

[2] El caso por el Art. 6 fue archivado y sobreseído posteriormente a base de la Regla 64(n)(2) de Procedimiento Criminal (Minuta de 18 de mayo de 1979).

Ave. Rexach, Bo. Obrero, Santurce. Un Jurado en proceso ante el Tribunal Superior, Sala de San Juan (Luis R. Apellániz, J.), rindió veredictos de culpabilidad por mayoría de 9 a 3. Fue sentenciado de manera concurrente a reclusión perpetua por el asesinato y a una pena de tres (3) a cinco (5) años de presidio por el Art. 8.

No conforme apela y discute diez errores. A los fines de evaluarlos apropiadamente es menester exponer los antecedentes fácticos y procesales que sirven de trasfondo al proceso, según la Exposición Narrativa de la Prueba y demás constancias reflejadas por los autos.

## I

*Antecedentes*

El 18 de octubre de 1978, como a las 8:00 p.m., en la Avenida Rexach de Barrio Obrero, Santurce, fue asesinado a balazos *José González De Jesús*. Meses después, el 12 de enero de 1979, el ciudadano Jorge Rivera León prestó declaración jurada que incriminaba al apelante Lebrón González y a Joaquín Lugo Mercado, en virtud de la cual se determinó causa probable y se ordenó el arresto de ambos por los delitos de asesinato en primer grado e infracción de los Arts. 6 y 8 de la Ley de Armas. Éstos fueron arrestados, prestaron fianza y salieron en libertad provisional. La vista preliminar se señaló para el 13 de marzo. No pudo celebrarse. La noche previa el testigo Rivera León fue muerto de un disparo en la región temporal izquierda del cráneo.

El asesinato del único testigo ocular logró su propósito. Los casos pendientes contra Lebrón González y Lugo Mercado por la muerte de José González De Jesús fueron finalmente archivados por carecer el Ministerio Público de prueba adicional suficiente para sostenerlos.

Así las cosas, el 14 de marzo de 1979 —previa entrevista con los agentes del Negociado de Investigaciones Criminales (NIC) Jorge Muñiz y José Santiago Esquilín— la joven Grissette González Ortiz (c/p Jessica) declaró bajo

juramento en la Fiscalía de San Juan. Reprodujo su testimonio ante un Magistrado de la Sala de Investigaciones de San Juan, quien determinó causa probable contra Lebrón González por haber participado, en unión a otros dos individuos no identificados, en la muerte del testigo Jorge Rivera León. Se ordenó y fue arrestado por el delito de Asesinato en Primer Grado e infracción a los Arts. 6 y 8 de la Ley de Armas. La vista preliminar no pudo celebrarse originalmente en ninguna de las fechas señaladas, ya que la única testigo Grissette González Ortiz había abandonado la jurisdicción. Posteriormente regresó. El caso fue reactivado y la vista preliminar se celebró el 6 de diciembre de 1979. Oportunamente nos referiremos en detalle a la misma. Se determinó causa probable contra Lebrón González. Después de la lectura de las acusaciones la defensa notificó su propósito de presentar la defensa y prueba de coartada. El caso fue objeto de otros trámites hasta que finalmente comenzó el proceso de selección del Jurado el jueves 29 de mayo, continuó el viernes, el lunes 2 de junio y finalizó el día 3.

En la mañana del 2 de junio de 1980 la prensa del país publicó a grandes titulares el asesinato y hallazgo del cadáver de la única testigo del caso, Grissette González Ortiz. La defensa solicitó la disolución del Jurado y aplazamiento de la vista, a lo cual se negó el tribunal. La publicidad continuó durante el proceso y los planteamientos reproducidos fueron denegados. Tras varios días de prueba, se produjo el veredicto y las sentencias apeladas.(³) Discutimos los errores.

## II

*Publicidad del Juicio*

Incidió el honorable tribunal a quo al denegar la solicitud de la defensa de disolución del jurado constituido a raíz del

---

(³) El 1ro de febrero de 1980, con esa misma prueba, se determinó que no existía causa probable contra Orlando Escalera.

asesinato de la testigo Grissette González Ortiz ocurrido antes de que comenzara el desfile de prueba violando así el derecho del acusado a un juicio imparcial y justo libre de prejuicio.

Así mismo incidió el tribunal a quo al denegar las solicitudes de disolución del jurado repetidamente y durante el tiempo que duró todo el proceso como resultado del exceso de publicidad de la prensa local en relación a la muerte de la testigo ya antes mencionada.

Así mismo incidió el tribunal a quo al negarse a la petición de la defensa de secuestrar el jurado a fines de evitar el impacto de la publicidad en ellos, violando así el derecho constitucional del acusado a un juicio imparcial y justo libre de prejuicio.

Siguiendo la metodología de las partes, analizaremos conjuntamente los tres primeros señalamientos de error.

Como denominador común el apelante Lebrón González plantea que la publicidad adversa de la prensa sobre su caso —comenzada supuestamente una semana antes del juicio por razón de una vista celebrada para entender en una moción de aumento de fianza promovida por el Ministerio Fiscal, y declarada sin lugar— constituyó "una campaña de publicidad inflamatoria", masiva y sensacionalista. Ésta se produjo diariamente y no se refería a las incidencias del proceso, lo que a su juicio "pudo haber producido un 'Lavado Cerebrar' [sic] o una acción refleja del principio de Pablov [sic] en la mente del juzgador, pues lo publicado no atinaba [sic] a lo que sucedía en el Tribunal pero relacionaba [sic] constantemente". Nos argumenta que el tribunal de instancia debió corregir y subsanar los daños de esa "publicidad adversa", ya fuera mediante la suspensión de los procedimientos por un término razonable o la incomunicación del Jurado. Admite que el tribunal en todo momento apercibió al Jurado de "que no habrían de formar un juicio prematuro de [su] inocencia o culpabilidad" y que "[c]onsistentemente y a preguntas del Tribunal el Jurado en pleno manifestaba en la negativa no [sic] haber ni escuchado, ni leído nada sobre el caso".

 No tiene razón. En el conflicto que surge entre el derecho de un acusado a un juicio justo e imparcial basado en la prueba desfilada en el recinto judicial y no en influencias extrañas, y el derecho fundamental de la prensa a publicar lo que ocurre en los tribunales, se han elaborado guías objetivas que permiten que coexistan armoniosamente ambos derechos. La doctrina reconoce que la simple publicación de noticias sobre un proceso judicial no violenta per se el derecho constitucional de un acusado, sobre quien recae el peso de la prueba para demostrar afirmativa y satisfactoriamente que las mismas fueron de tal naturaleza, impacto y exposición que le han privado de un juicio ante Jurado imparcial. *Pueblo* v. *Maldonado Dipiní*, 96 D.P.R. 897, 908 (1969). Lo contrario inhibiría el que fueran encausados acusados de gran notoriedad o casos revestidos de interés público en una sociedad democrática —que se caracteriza por el libre flujo de ideas y noticias— limitándose el derecho del ciudadano a la información. *Soto* v. *Srio. de Justicia*, 112 D.P.R. 477 (1982). Únicamente mediante una prohibición absoluta que interfiera con el derecho de la prensa a publicar noticias de interés general podría lograrse ese fin. *Pueblo* v. *Pérez Santaliz*, 105 D.P.R. 10 (1976). Lo expuesto cobra particular énfasis en nuestro país en "donde el territorio es reducido y la población compacta, servida por medios de comunicación y difusión de eficacia máxima, sería imposible formar un jurado totalmente ignorante y desconocedor. . . . La justicia no puede por tanto depender de la ignorancia, sino de la integridad de los jurados y de la firmeza de su compromiso de resolver guiados únicamente por la prueba que se presente en juicio". *Pueblo* v. *Tursi*, 105 D.P.R. 717, 720 (1977). Aun así, la misma doctrina admite la probabilidad de perjuicio "cuando la publicidad es parcializada, inflamatoria, derogativa o tan intensa que pueda razonablemente inferirse una atmósfera de pasión contra el acusado". *Pueblo* v. *Pérez Santaliz*, supra pág. 15.

En el caso de autos el apelante alega que la publicidad adversa: (1) comenzó una semana antes de iniciarse el juicio, cuando el Ministerio Público solicitó un aumento en la fianza; (2) debió producir la disolución del Jurado y la suspensión del proceso a raíz del asesinato de la única testigo de cargo, Grissette González Ortiz; y (3) fue leída por el Jurado en contravención de las instrucciones específicas del tribunal, tal y como se deduce de la interlocución del presidente de ese cuerpo al referirse al testimonio de "Jessica" —en ocasión de solicitar que se leyera nuevamente su declaración— pues alegadamente ese apodo sólo se mencionaba en la prensa.

En cuanto a los dos primeros aspectos, incidentes sobre aumento de fianza y el asesinato de la testigo ocular, notamos que ambos acaecieron antes de que se seleccionara, juramentara y se constituyera *definitivamente* el panel de jurados el día 3 de junio de 1980. Ciertamente, durante la desinsaculación del Jurado, el apelante tuvo amplia oportunidad de examinarlos. Curiosamente, salvo la solicitud formulada en términos generales de disolverlo, no cuestionó allí —como tampoco ante este foro— prejuicio alguno específico en la capacidad e integridad de los miembros individuales para juzgarlo justamente.

Respecto a la referencia del presidente del Jurado al apodo de "Jessica", independientemente de que es especulativo derivar sobre ese detalle una conclusión absoluta de que el Jurado leyera a diario reseñas de periódicos o estuviera incapacitado para adjudicar con ecuanimidad, ese apodo había sido mencionado por el testigo de cargo, el agente José Santiago Esquilín, quien en el directo se refirió a Grissette González como "la joven llama[da] Jessica". (E.N.P., pág. 9.)

Lo anterior bastaría para disponer de los señalamientos. Ahora bien, en nuestra misión de juzgar rectamente todo caso, hemos realizado un pausado y minucioso análisis de las noticias de la prensa del país sometidas en evidencia por

la defensa durante el proceso en apoyo de sus solicitudes de suspensión y disolución del Jurado los días 3, 6 y 11 de junio de 1980. El mismo refleja lo siguiente en cuanto a fecha, periódico, página, titular, síntesis, y recoge nuestra apreciación objetiva de su contenido.

*Domingo 25 de mayo de 1980: El Mundo*, pág. 4-A, "Juez Halla Sin Lugar Petición de Aumentar Fianza a Acusado". La noticia relaciona fielmente las incidencias y dictamen del Juez Daniel López Pritchard, que declara sin lugar el aumento a un millón de dólares solicitado por el Ministerio Fiscal en la fianza contra el acusado. Reseña correctamente los planteamientos de las partes. *No lo consideramos parcializado, inflamatorio ni derogatorio.*

*Martes 3 de junio de 1980: El Mundo*, pág. 5-B, "Ultiman a Balazos Testigo Estrella en Caso de Asesinato". Se informa el comienzo del proceso contra el acusado, la muerte violenta de la testigo Grissette González Ortiz y el incidente previo de la negativa judicial a aumentar la fianza. *El Vocero*, págs. 1 y 3, "Buscan Autores Crimen Jessica — Era Testigo contra Tito Camaro". Expone las gestiones de los agentes del NIC para buscar pistas del asesinato de la víctima Jessica, testigo contra el acusado, se informa sobre la vista anterior en que se deniega el aumento de la fianza, y que la Policía la había estado protegiendo, pero que ella, una semana antes rehusó continuar protegida, salió rumbo a Arecibo, fue interceptada y ejecutada por desconocidos. *El Nuevo Día*, (no surge la página), "En Cerro Gordo, Policía Identifica Muchacha Asesinada". Expresa el hallazgo del cadáver de Jessica, testigo principal contra el acusado, sus supuestas últimas palabras, dónde fue descubierto, heridas del cadáver, y su participación en el caso. *Ninguna de estas noticias las consideramos inflamatorias, parcializadas ni derogatorias.*

*Miércoles 4 de junio de 1980: The San Juan Star*, pág. 7, "Slain Murder — Trial Witness May Still be Heard". Expone el asesinato, sitio y heridas de Jessica, su condición

de única testigo contra el acusado, el incidente y la negativa de aumento de fianza, la protección que recibía de la Policía y su partida voluntaria, y la opinión del Supervisor del NIC, Jorge Núñez, de que su muerte —sospechosamente realizada para eliminar su testimonio en el caso contra el acusado— no afectaría la continuación del proceso, pues su testimonio prestado en la vista preliminar a base de una enmienda reciente en la Ley de Evidencia podía utilizarse por primera vez en Puerto Rico. *Determinamos que salvo la expresión especulativa —aunque no carente de alguna lógica— de que el asesinato estuviera motivado para removerla como testigo, la noticia relaciona fielmente los hechos, el proceso y las alternativas forenses.*

*Jueves 5 de junio de 1980: El Mundo,* pág. 8, Editorial, "Imperdonable Falla de la Policía". Se critica a la Policía por no haberle prestado adecuada protección y no evitar su muerte. Específicamente se consigna que ella era "testigo estrella en el caso de homicidio que se sigue contra *un notorio delincuente*" y que el asunto deja "la impresión de impotencia ante la poderosa mano del hampa que vuelven a dejar las Autoridades". Salvo la referencia a "notorio delincuente" y "poderosa mano del hampa" —expresiones que tienden a sugerir que el acusado se benefició con su muerte— el editorial está dirigido contra la Policía. La expresión "notorio delincuente" es derogatoria. *El Vocero,* págs. 3 y 59, "Sin Pista en Crimen de Jessica". Se dà cuenta del sepelio de la testigo ejecutada, su condición de ser "testigo estrella" contra el acusado; que su muerte se produjo un día antes de iniciarse el proceso; que ella había dado a las autoridades una amplia declaración; que se le había provisto protección; que la investigación estaba estancada sin lograrse la más mínima pista no obstante haberse entrevistado más de 30 testigos. *El Mundo,* pág. 9-B, "Tribunal Decidirá si Acepta Testimonio Occisa de Evidencia". Expone la "batalla legal" sobre si el testimonio prestado por Jessica en la Vista Preliminar es admisible o no, y relaciona

las incidencias y posiciones legales de los abogados sobre este extremo.

*Lunes 9 de junio de 1980: El Vocero*, pág. 3, "NIE Investiga Crimen Jessica". Consigna que el Negociado de Investigaciones Especiales del Departamento de Justicia (NIE) ocupó los revólveres de reglamento del personal de la Sección de Homicidios y Delitos Sexuales del NIC para examen de balística; que podría pronto esclarecerse el crimen; que la acción causó disgustos entre el personal; y que ella figuraba como testigo estrella contra el acusado por "hechos que presuntamente presenció". *El Nuevo Día*, pág. 6, "Retienen Armas a Agentes del NIC". Relaciona la investigación de balística de armas de los agentes; que la víctima era testigo estrella contra el acusado. Se consigna que "el hombre contra quien ella debió declarar, 'Tito Camaro', *ha sido investigado, o se le ha conectado con más de media docena de asesinatos, pero las acusaciones nunca han progresado debido a que los testigos en su contra también han muerto de bala. Uno de los primeros crímenes en que fue acusado Tito Camaro correspondió al de un norteamericano, que según el pliego acusatorio entonces murió a tiros cuando se negó a discuplarse [sic] por pisarle un pie a 'Camaro' ". En la medida en que la noticia expone un historial de asociación delictiva del acusado y la muerte de testigos y de un norteamericano, ciertamente la noticia es inflamatoria y nociva.* *El Mundo*, pág. 5-A, "NIE Busca Nuevos Ángulos Caso Asesinato Testigo Principal Crimen". Informa gestiones del NIE para esclarecer el crimen de testigo principal "por el cual se está juzgando a un sospechoso"; que se recogieron revólveres a personal del NIC y de la Sección de Delitos Sexuales; que la autopsia reveló que tenía tres meses de embarazo; que ella temía por su vida; que se le proveyó protección; dónde y cómo fue hallado su cadáver; que el juicio contra el acusado comenzó la semana pasada y que los fiscales cuentan con su declaración previa y los abogados de la defensa la objetan.

*Miércoles 11 de junio de 1980: El Nuevo Día*, pág. 12, "Declararán 50 Policías Por la Muerte de Jessica". Relaciona que ante el NIC, como parte de la investigación, han sido citados como 50 agentes; que ella "figuraba como testigo estrella en una investigación que se sigue relacionada con un crimen que se le imputa a José Luis Lebrón González, conocido por 'Tito Camaro'. *'Camaro' ha sido investigado, o acusado, por más de media docena de asesinatos"*. Informa la muerte, protección, embarazo de Jessica, y termina señalando que empleados de la Cámara de Representantes fueron también citados con "relación con la desaparición de tres revólveres de la Oficina, propiedad de la Cámara". *Con excepción de la referencia a que el acusado ha sido investigativamente vinculado o acusado de varios asesinatos, la noticia no contiene material irritante. El Vocero*, págs. 1 y 3, "Crimen de Jessica a Punto de Esclarecerse". Consigna el esfuerzo de las autoridades por aclarar su asesinato, la investigación de 50 miembros de la Policía, dónde fue hallado el cadáver; contra quién declararía; datos sobre los objetos encontrados en el lugar del crimen y la presencia de un auto sospechoso y sus tres meses de embarazo. *El Mundo*, págs. 1 y 16-A, "Investigan Varios Agentes en Relación a un Asesinato". Da cuenta sobre que el NIE investiga la posibilidad de que un agente del NIC esté involucrado en la muerte de Jessica; su condición de testigo estrella; expone las razones para la investigación; que estaba bajo protección policíaca y embarazada. *The San Juan Star*, pág. 6, "Slain Girl to 'Testify' in Trial of Man Charged in Slaying of Other Witness". Informa que el Juez Luis R. Apellániz decidió admitir la declaración jurada de Jessica en la causa contra el acusado sobre su objeción y que apelaría al Tribunal Supremo; que ella estaba bajo protección, rehusó continuar protegida y fue asesinada; y que estaba embarazada. La noticia relaciona con razonable exactitud los incidentes y planteamientos de derecho de los abogados y Fiscal, y que el NIC continúa investigando.

*Jueves 12 de junio de 1980: El Mundo*, pág. 15-D, "Madrastra Cuestiona Tardanza de la Policía Informar Muerte Hijastra". Informe de la queja de la Sra. Tomasa Borrero, madrastra de Jessica, por la tardanza de la Policía en notificarle su muerte (tres días); que se enteró por la prensa; que hay algo sospechoso y el Gobernador debe exigirle al Superintendente de la Policía que lo aclare; que hace unos años compró una póliza de vida para Grissette; que se entrevistó con personal del NIC y visitó el Instituto de Medicina Forense; que ha sufrido por su muerte; que la occisa era buena e inteligente; que la investigación continúa, y que no se obtuvo comentario sobre el resultado del examen balístico realizado a las armas de 87 agentes del NIC. *El Vocero*, pág. 4, "Madrastra de Jessica Gestiona Cobro Seguro $5 Mil". Expone la reacción de la madrastra al enterarse de la muerte de Jessica; que visitó el Cuartel de la Policía para gestionar la documentación necesaria relacionada con el seguro; que se enteró de la noticia por la prensa; lo angustiada que estaba; y que la muerte se produjo un día antes de que Jessica compareciera al juicio contra el acusado como testigo estrella. *El Nuevo Día*, pág. 22, "La Madrastra de Jessica le Advirtió el Peligro". Describe la reacción de la madrastra ante la noticia de la muerte en ocasión de visitar las oficinas del NIC; su queja de que no le informaron antes; que tenía la intención de sacar un seguro de vida; que Jessica abandonó la casa durante un año más o menos.

*Martes 17 de junio de 1980: El Vocero*, pág. 4, "Madrastra Niega Jessica Tuviese Seguro de Vida". Expone que la madrastra lo aclaró en su visita a la redacción de ese rotativo, pues estaba confundida en cuanto a que existiera un seguro de vida.

De las noticias relacionadas, varias observaciones se imponen. *Primero*, salvo las instancias aisladas que hemos subrayado, las abundantes reseñas y noticias periodísticas no son ni cuantitativa ni sustancialmente parcializadas, de

carácter inflamatorio o derogatorio, de suerte que nos permitan razonablemente sostener la existencia de una continuada "atmósfera de pasión contra el acusado" que no fuera susceptible de ser contrarrestada con las constantes y precisas instrucciones que el tribunal sentenciador adoptó. *Segundo*, la información publicada tenía como tema central el misterioso asesinato de la principal testigo en su contra, aun cuando estaba bajo protección de la Policía. Con carácter incidental hacía mención al proceso seguido en contra del apelante. *Tercero*, la expresión de su condición "de testigo estrella", es una realidad que representa más bien una adjetivación de la prensa. No es derogatoria. *Cuarto*, la forma en que su cadáver fue descubierto, las heridas y demás circunstancias reflejan una información fiel, asequible al público, del trágico suceso. *Quinto*, la relación previa de estas reseñas ilustra su carácter repetitivo, pero no ofensivo. *Sexto*, la situación particular de que el crimen ocurre en el momento en que se juzgaba al apelante del asesinato de otro testigo ocular de otro caso —ambos relacionados con él mismo— es una coincidencia fáctica que naturalmente atraía la atención de la prensa del país. *Séptimo*, la novedad que planteaba el debate forense sobre la aplicación de nuevos principios evidenciarios en torno a la admisibilidad de un testimonio ofrecido en otra vista, en unión a la investigación de que era objeto la propia Policía por el asesinato de una testigo bajo protección especial, fueron circunstancias que imprimieron al asesinato gran interés público. Y *octavo*, todos los artículos, en la medida que describen fielmente los incidentes del juicio, son correctos. Las expresiones aisladas adversas fueron la excepción.

Recapitulando, del examen expuesto surge que la noticia del juicio se mantuvo en los periódicos del país, pero girando sobre el hecho incuestionable de la muerte violenta de Jessica, única testigo ocular contra el apelante en el caso por asesinato de otro testigo. A poco que reflexionamos nos percatamos de que esos hechos —muerte, condición de "tes-

tigo estrella", la acusación de asesinato previa contra el apelante archivada por falta de prueba (muerte del otro testigo)— eran elementos de prueba que forzosamente vendrían —como vinieron— a la atención del Jurado como parte normal de la evidencia y del proceso judicial. Difícilmente, por no decir imposible, podían ellos juzgar en su perspectiva integral los méritos de la acusación sin conocerlos. La única información derogatoria —asociar al apelante Lebrón González con un historial delictivo e identificarlo como "notorio delincuente"— no era razón suficiente para disolver el Jurado. Las advertencias continuas del tribunal al Jurado eran remedios correctivos apropiados. Pretender inmunizar a los jurados del ambiente que les rodea es humanamente imposible. "El derecho crece y se consolida desechando ficciones y afincándose en la realidad." *Pueblo* v. *Pérez Santaliz*, supra, pág. 23. La realidad de los hechos y proceso narrados por la prensa del país, la fidelidad sustancial a los sucesos del crimen y las intervenciones y advertencias del tribunal, no nos permiten coincidir con el apelante. El ejercicio de la libertad informativa por la prensa no corrompió el proceso ni constituyó una masiva campaña de publicidad hostil.

Tampoco procedía la suspensión indefinida ni la alternativa del secuestro o incomunicación del Jurado. Las noticias en cuestión no se referían única y exclusivamente al hecho concreto del asesinato y hallazgo del cadáver de la testigo de cargo Grissette González Ortiz, sino que versaba sobre la evolución de los acontecimientos e investigación que estaba realizando el Negociado de Investigaciones Especiales (NIE) del Departamento de Justicia sobre la adecuacidad de la protección policiaca. Tomamos conocimiento judicial de que estas gestiones y el interés de la prensa se extendieron meses después de haber concluido el juicio. Claramente la suspensión indefinida de los procedimientos, ante esa realidad, no hubiese tenido el resultado

deseado. Respecto al secuestro del Jurado no nos ha demostrado que, en vista del carácter de las noticias, ello fuera una alternativa aconsejable que superara —debido al factor tiempo— cualesquier otros efectos negativos que pudiera esa medida generar en contra de su causa por razón de una "reacción sicológica" adversa del Jurado. Véase *Pueblo* v. *Dones Arroyo*, 106 D.P.R. 303, 320 (1977).

### III

*Aplicabilidad de la Regla 64 de Evidencia*

> Que el tribunal cometió error al admitir prueba sobre el testimonio de una testigo ausente al amparo de la Regla 64 de las de Evidencia.

El apelante cuestiona la decisión del tribunal de instancia de admitir en el juicio el testimonio de la testigo asesinada, Grissette González Ortiz (Jessica), según ofrecido durante la vista preliminar del caso y perpetuado en las notas taquigráficas tomadas por una fiscal asistente. Argumenta que las nuevas Reglas de Evidencia de 1979 no estaban vigentes para la fecha de los hechos y, por ende, su aplicación es inconstitucional por violentar la prohibición contenida en nuestra Constitución sobre leyes *ex post facto*. Art. II, Sec. 12. Sostiene que de haberse aplicado la Ley de Evidencia derogada, "la posición del acusado hubiera sido más ventajosa y el resultado del proceso probablemente hubiera sido distinto". Expone que esa prueba sobre testimonio fue basada en "los recuerdos imprecisos de los oficiales del Tribunal que actuaron en la vista preliminar y en unas notas taquigráficas tomadas por el Fiscal asistente de parte del tes[ti]monio de la testigo ausente". Finalmente aduce que el contrainterrogatorio que se realiza en una vista preliminar no es de la misma naturaleza y extensión que el del juicio en los méritos. No tiene razón. Nos explicamos.

La Regla 83 de las actuales Reglas de Evidencia expresamente dispone que regirán desde el 1ro de octubre de

1979 "y se aplicarán a todos los procedimientos o acciones iniciados *en o después de esa fecha*". Se establece "que un juicio comienza con la *presentación de juramento del primer testigo* o cuando se admite en evidencia el primer exhibit". En el caso de autos, el juicio comenzó el 6 de junio de 1980 con la presentación del primer testigo del Ministerio Público, el patólogo doctor Sorvill. A esa fecha, y desde el 1ro de octubre de 1979, estaban vigentes las nuevas Reglas de Evidencia.

█ Ahora bien, en la medida en que la prohibición constitucional sobre leyes *ex post facto* sólo cobra virtualidad si conlleva que evidenciariamente se requiera menos prueba que la exigida por la ley al momento de la comisión del delito para castigar al acusado —en las dimensiones constitucionales de la presunción de inocencia, la garantía de que se pruebe la culpabilidad más allá de duda razonable y el derecho a juicio por Jurado, *Fernández v. Rivera, Jefe del Presidio*, 70 D.P.R. 900, 903 (1950)— o que "en relación con el delito o sus consecuencias, [se] altere la situación del acusado en forma desfavorable para él", *Pueblo v. Pérez Méndez*, 83 D.P.R. 539, 545 (1961), no estando presentes estas situaciones en el caso de autos, es inaplicable la cláusula sobre leyes *ex post facto*.

█ El testimonio de Jessica era válidamente admisible bajo las disposiciones del derogado Art. 397 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 1678, según lo habíamos resuelto en *Pueblo v. Rosado Alvarado*, 89 D.P.R. 875, 881 (1964). Bajo ese artículo, al igual que bajo la Regla 64 de Evidencia, el testimonio de un testigo no disponible, que hubiese *fallecido*, o se hallare fuera de la jurisdicción, o estuviere imposibilitado para testificar, prestado en una causa anterior entre las mismas partes, y referente al mismo asunto, *era admisible*.

La Regla 64(B)(1) de las Reglas de Evidencia de 1979 reitera esa norma ampliándola al eliminar la restricción de que el testimonio anterior tiene que haber sido prestado en

una causa entre las mismas partes, sujeto a que dicho testimonio anterior sea ofrecido ahora contra quien en aquella ocasión previa ofreció dicho testimonio para su beneficio o tuvo en esa ocasión oportunidad de contrainterrogar al declarante con un interés y motivo similar al que tiene ahora en la vista.

En resumen, la situación del apelante bajo la Regla 64(B)(1) no alteró ni afectó la norma evidenciaria prevaleciente. El testimonio de Jessica fue prestado en la vista preliminar en un caso, referente al mismo asunto, donde el apelante tuvo la oportunidad —como lo hizo— de contrainterrogarla.

■ En *Pueblo* v. *Ríos Nogueras*, 111 D.P.R. 647 (1981), resolvimos que el testimonio escrito producto de una vista preliminar, presentado por el fiscal en el juicio en sustitución de la declaración del testigo no disponible era admisible por gozar de suficiente garantía circunstancial de veracidad, exactitud y haber estado sujeto a la oportunidad del contrainterrogatorio. Ya antes, en *Pueblo* v. *Ruiz Lebrón*, 111 D.P.R. 435 (1981), habíamos sostenido la validez constitucional de la Regla 64(B)(1) apoyándonos en *Ohio* v. *Roberts*, 448 U.S. 56 (1980), en que se rechazó un planteamiento similar al del apelante en el sentido de que el contrainterrogatorio en la vista preliminar era de naturaleza distinta. Lo crucial, con relación al derecho de confrontación, es la *oportunidad de contrainterrogar durante el testimonio anterior*, y no si efectivamente se contrainterrogó.

Este mismo caso, *Ríos Nogueras*, supra, dispone adversamente del señalamiento del apelante sobre la insuficiencia y método de reproducirlo. A tal efecto allí resolvimos que el testimonio anterior puede demostrarse: "(1) por la declaración de un observador presente en la anterior vista, quien deberá dejar al Tribunal satisfecho de que puede recordar el sentido o substancia de lo que dijo el testigo, aún cuando no pueda recordar las palabras exactas; (2) por la declaración de un observador directo que ha refrescado su

memoria con un memorando como las notas de un taquígrafo, o la transcripción; (3) el récord taquigráfico oficial que tenga condición de récord público, o las notas de un observador del juicio si llena requisitos de memoria preservada en forma escrita. Estos métodos alternos de prueba están disponibles, pues lo que se intenta probar es el testimonio anterior y no la transcripción oficial, y por tanto no se aplica la regla de mejor evidencia." Pág. 654.

■ En el caso ante nos indudablemente se probó el contenido y confiabilidad del testimonio —directo y por contrainterrogatorio— prestado por Jessica en la vista preliminar. Se identificó y demostró la fidelidad de la transcripción de las notas taquigráficas allí tomadas por la fiscal Isabel Delgado de Rivera quien —según estipulación— posee un Bachiller en Ciencias Sociales con 30 créditos en taquigrafía y la destreza y experiencia necesarias para tomar dictados o deposiciones mediante el uso de la taquigrafía. La Juez de Distrito, Laura E. Nieves, que presidió esa vista preliminar atestó que conforme sus propias notas, la mencionada transcripción de las notas taquigráficas recogía sustancial y cuantitativamente lo mismo que ella recordaba y que eran superiores a sus notas, por ser más completas y abarcadoras.

## IV

*Suficiencia de la Prueba e Identificación*

Que el tribunal cometió error al denegar una solicitud de absolución perentoria basada en la insuficiencia de prueba.

Que el tribunal cometió error al denegar una solicitud de absolución basada en que no hubo una identificación adecuada del acusado.

Discutiremos conjuntamente estos errores que tratan sobre la insuficiencia de la prueba y la identificación del apelante como autor de los delitos y el no haberse utilizado la rueda de detenidos como método de identificación.

Resolvemos que en las circunstancias particulares, a tono con la doctrina imperante, era innecesaria la celebración de una rueda de detenidos. *Pueblo* v. *Montañez Ramos*, 100 D.P.R. 911 (1972). Veamos.

Jessica declaró que había visto en Barrio Obrero a "Tito Camaro" varias veces antes de los hechos; que había oído de él; y que un primo de ella se lo había señalado como un "criminal". La fiscal Isabel Delgado de Rivera corroboró este extremo. (E.N.P., pág. 13.) La juez Laura E. Nieves expresó que en la vista preliminar Jessica "declaró que los dos autores de los hechos a Bolo [el occiso], habían sido Tito Camaro *señalando a José Luis Lebrón González* y al otro acusado sentado al lado de su abogado, la testigo identificó en sala al apelante como la persona señalada por la testigo Grissette González Ortiz en la Vista Preliminar . . . y que además indicó que Tito Camaro y José Luis Lebrón era la misma persona". (E.N.P., págs. 14–15.)

Finalmente, el agente José Santiago Esquilín declaró que debido a que la testigo le había dicho que conocía por mucho tiempo al autor de los hechos ocurridos en la calle Laguna, no hizo rueda de confrontación. No se cometieron los errores.

## V

*Solicitud de Inspección Ocular y Admisibilidad de Fotografías y Prueba Pericial*

Que el tribunal cometió error al denegar una inspección ocular del lugar en donde ocurrieron los hechos, solicitada por la defensa con la intención de demostrar que la testigo en vista a su testimonio tenía su visión obstruida por razón del lugar en donde se encontraba.

Erró el tribunal a quo al impedir a la defensa sentar base y presentar evidencia documental basada en fotografías del lugar de los hechos y un crokis [*sic*] del lugar de los hechos acreditativo de que la testigo ausente contradecía su testimonio anterior.

El tribunal a quo cometió error al no permitir prueba de peritaje relacionada con el propósito de la defensa de establecer la imposibilidad de la observación de los hechos según la testigo ausente, así como también la posibilidad de observación de testigos de la defensa.

El apelante primeramente discute la procedencia de una inspección ocular del lugar de los hechos, para así constatar la "incongruencia" de la testigo ocular. Segundo, alega como error la negativa del tribunal sentenciador de admitir en evidencia una carta supuestamente enviada por la testigo asesinada, González Ortiz, a la Lic. Jeanne Hoffman Maurino en la cual la testigo reiteraba lo que le había comunicado a la Lic. Hoffman y al Lic. Luis Felipe Vázquez en una supuesta visita que les hiciera a principios del año 1979 respecto a que no conocía al apelante Lebrón y que había actuado presionada por la Policía. Bajo este señalamiento se cuestiona el dictamen que deniega la solicitud de la defensa de que se le permitiera producir a la testigo Tomasa Borrero —madre de la occisa— con el fin de que verificara y acreditara la firma como la de su hija de crianza Grissette González Ortiz.

Y en tercer lugar, se queja el apelante de no habérsele admitido: (a) ciertas fotografías; (b) un plano del lugar de los hechos; y (c) el testimonio del perito fotográfico. Esa evidencia tenía el propósito de demostrar la imposibilidad física de la testigo ausente de haber podido ver hacia el lugar de los hechos, así como también establecer el ángulo de visión desde una ventana que poseía uno de los testigos de la defensa, E. Sellas González.

La negativa a la solicitud de inspección ocular en el lugar de los hechos respondió, según el foro de instancia, a que se había ofrecido prueba suficiente con relación al lugar de los hechos. No erró. La concesión de una inspección ocular es función que cae en el ámbito de discreción judicial. Sólo procede si se demuestra que ello habrá de auxiliar al Jurado o al juez a apreciar correctamente la prueba que

haya desfilado o que se proponga desfilar. *Pueblo* v. *Pagán Díaz*, 111 D.P.R. 608 (1981).

El dictamen del tribunal fue correcto. La prueba de cargo[4] estableció con meridiana claridad las características físicas del lugar del crimen, el sitio desde donde lo observó la testigo y el lugar donde cayó la víctima Jorge Rivera León. El análisis integral demuestra que no era imposible —como se sugiere— que la testigo pudiera ver y presenciar el suceso, o que su testimonio fuera inverosímil. De haber merecido crédito al Jurado —como mereció— dicho foro poseía suficientes elementos de prueba sobre el sitio para dilucidar y adjudicar los conflictos entre la evidencia de cargo y la defensa. No constituyó abuso la negativa de acceder a la inspección ocular.

En esta misma perspectiva debe examinarse la negativa a admitir en evidencia unas fotografías y un plano del lugar de los hechos ofrecidos por la defensa. Su propósito era demostrar la imposibilidad de que la testigo ausente pudiera ver hacia el lugar de los hechos, ". . . así como también el ángulo de visión desde la ventana del testigo de la defensa Sr. Sellas". Sobre las fotografías apreciamos —posiblemente debido a la técnica de reproducción— unas líneas brillantes y rojas no explicadas. Ello afectó su utilidad y contrasta con la nitidez de las fotografías del Ministerio Público.

Independientemente de lo expuesto, bajo el supuesto de que las mismas fueran admisibles, ello no perjudicó ni situó al apelante en estado de indefensión. Se trataba de reproducir escenas ya contenidas en las fotografías presentadas por el Ministerio Público —que el apelante utilizó— y recogían con mayor fidelidad el lugar a raíz del crimen. Con

---

[4] Consistente de varias fotografías, el testimonio del agente investigador Santiago Esquilín —quien además dibujó un croquis en la pizarra del tribunal— y la declaración de la testigo Grissette González Ortiz. La fidelidad y contemporaneidad de las fotografías reflejan datos suficientes, inclusive las manchas de sangre todavía existentes en el pavimento.

ello expuso ante el Jurado plenamente su teoría. Bajo el enfoque evidenciario más favorable, resolvemos que no estamos ante un error de índole perjudicial.

En torno al plano preparado por el testigo agrimensor Rafael Carrera, aunque el apelante señala que fue preparado única y exclusivamente por la información vertida por la propia testigo ausente y basado en la investigación y fotografías tomadas por la Policía, ello no surge de la Exposición Narrativa de la Prueba. En esas circunstancias no nos ha puesto en condiciones de evaluar su admisibilidad. Aun bajo esa hipótesis nuevamente estaríamos ante un error no perjudicial, ya que la fuente original que sirvió de base para su confección fue sometida y evaluada por el Jurado. En estas circunstancias no podemos concluir que el efecto de excluir la prueba —bajo la premisa de que fuera admisible— "fue un factor decisivo o sustancial en la sentencia". *Pueblo* v. *Franceschini Sáez*, 110 D.P.R. 794, 799 (1981). Regla 5 de Evidencia.

Respecto al apuntamiento sobre la inadmisibilidad de la carta supuestamente enviada por Jessica a la licenciada Hoffman, la defensa no autenticó dicho documento pues la licenciada Hoffman no conocía ni pudo identificar la firma de su presunta autora. Tampoco se presentó prueba pericial para cumplir con ese extremo. No procedía su admisión. Regla 75 de Evidencia.

La solicitud de la defensa de paralizar los procedimientos hasta que se localizara y compareciera la madrastra de Jessica, Sra. Tomasa Borrero —hecha el día en que el Jurado comenzaría a deliberar— fue irrazonablemente tardía. No se nos ha explicado el porqué de la tardanza, habida cuenta del tiempo que medió previamente para diligentemente citarla y obtener su presencia. No obstante, el tribunal ordenó que se localizara y, solamente una vez informado por el alguacil del resultado negativo de sus gestiones, denegó tal pedido.

# VI

*Corrección en la Apreciación de la Prueba*

Las sentencias apeladas son el resultado del manifiesto error en la apreciación de la evidencia desfilada y como tal son contrarias a derecho.

El apelante impugna la suficiencia y credibilidad de la prueba de cargo. Argumenta que el testimonio de la testigo Grissette González Ortiz era de "falta de credibilidad inherente". A tal efecto discute el conflicto de ese testimonio con los hallazgos de la autopsia referentes a: (1) que el cadáver evidenciaba una sola herida de bala —cuando ella indicó que el apelante le hizo "dos disparos"; y (2) el alto grado de alcohol en la sangre que tenía el occiso (embriaguez) —frente a la versión de ella de que aquél "iba caminando lo más tranquilo, lo más normal y lo más sereno". Apunta además ser increíble, en términos del factor tiempo, que después de que ella viera el asesinato, corriera hacia la casa de su tía en la Ave. Puerto Rico y pudiera volver a suministrarle a la víctima primeros auxilios.

No tiene razón. En cuanto al alegado conflicto testimonial originado en la herida de una sola bala, ese hecho *no excluye* que en realidad se hicieran dos disparos, aunque solamente uno penetrara el cuerpo de la víctima. Nótese que el patólogo Dr. Marino Sorvill declaró que el "plomo penetr[ó] en la cavidad craneal a través del hueso temporal dirigiéndose de izquierda a derecha . . . [ y la] herida fue producida por un tiro de cerca, por el ancho del orificio, pero *no fue un tiro de contacto*, ya que la piel y el área alrededor de la herida no mostraban evidencia de pólvora". (E.N.P., pág. 4.) En estas circunstancias no es incompatible que se dispararan dos tiros aunque uno solo impactara a la víctima y produjera la herida mortal.

Sobre el estado de embriaguez del occiso según el alto contenido de alcohol en la sangre, si bien la testigo manifestó que la víctima iba caminando normal, tranquilo y

sereno antes de ser ultimado, en el contrainterrogatorio de la vista preliminar ella aclaró:

P. ¿Ud. dice que Bolo [la víctima] caminaba normal? ¿Caminaba como yo, derecho?

—No. *Bolo estaba bajo embriaguez.*
—*Yo no puedo caminar como él porque no estoy borracha.*
*No puedo describir la forma en que caminaba.*

P. ¿Quién le dijo que estaba borracho?

—Porque él siempre bebía para todo. Siempre pedía una caneca.

P. ¿Cuál era la forma de él caminar?
—*Iba como tambaleándose pero no se caía.*
—*No tenía que agarrarse de nada para poder caminar.*
(Énfasis suplido.) *Exhibit* IX, págs. 18–19.

Como correctamente expone el Procurador General, la testigo se refería al estado de "ánimo del occiso; quería señalar que el occiso iba tranquilo, sin que estuviera peleando, en riña o en discusión con alguien más, cuando Tito Camaro le disparó". Y con referencia a que la testigo expuso que al ocurrir los hechos corrió para casa de su tía y regresó a auxiliar al occiso, no se demostró que ello fuera increíble por razón del tiempo.

Superadas las supuestas contradicciones, la presencia de la testigo en el lugar del crimen queda confirmada: (1) por la sangre que incuestionablemente mostraba su camisa, detalle que armoniza con su acción de darle "boca artificial" sin resultado o con ayudar a montarlo en la guagua para llevarlo al dispensario; y (2) con el conocimiento previo de que el apelante le disparó al occiso por la parte izquierda de la cabeza, aun cuando el propio médico de turno, Dr. José Cairido, del Dispensario Belaval al cual trasladaron la víctima, le comunicó al agente Esquilín "que la causa de la muerte fue herida o heridas de balas en la cabeza con tal magnitud de destrucción que no se pudo determinar su entrada ni salida". (*Exhibit* 7 de la defensa.) Esta conclusión se robustece, además, en que ella fue la única testigo que

—superado el miedo original que tenía— cooperó y prestó declaración a la Policía dos días después, frente al esfuerzo "de entrevistar a varias personas en la referida calle . . . [esfuerzo] inútil ya que nadie sabía nada". (*Exhibit* O de la defensa, informe escrito del agente Santiago Esquilín.) Ello compara curiosamente con el silencio del testigo de la defensa, Miguel Báez Clemente, quien en el dispensario le dijo al agente Esquilín "que no sabía nada" (E.N.P., pág. 9); y del testigo Eduardo Sellas González.

En síntesis, el testimonio de Grissette González Ortiz (Jessica) demostró —en lo esencial— que el apelante asesinó al testigo ocular Jorge Rivera León haciéndole dos disparos; que ella trató de auxiliar a la víctima; que llegó una guagua y lo trasladaron al Dispensario Belaval, en Barrio Obrero; que allí la entrevistó el agente Esquilín y por miedo no declaró; que su madrastra sabía del caso, pues la vió a ella esa noche con la cara y la ropa cubierta de sangre; que el apelante, al dispararle a la víctima, le dijo "para que no seas chota"; que hizo dos disparos, con el arma en su mano derecha, por el lado izquierdo del occiso; que el occiso no caminaba derecho y estaba en estado de embriaguez; y que el disparo no fue por la sien, sino por detrás de la oreja. Esa prueba es suficiente en Derecho para sostener las sentencias. Los demás testigos de cargo afianzan su veracidad. Así creída por el Jurado, no existe base jurídica por la cual debamos intervenir con esa apreciación, en ausencia de pasión, prejuicio o error manifiesto. *Pueblo* v. *Ortiz González*, 111 D.P.R. 408 (1981).

Por los fundamentos expuestos, se dictará sentencia confirmatoria.

El Juez Asociado Señor Díaz Cruz concurre en el resultado sin opinión.