Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>ÁNGEL TORRES FELICIANO<br><br>Apelante | KLAN202500135 | *Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Caguas*<br><br>Sobre:<br>Art. 93 C.P.,<br>Art. 5.04 L.A.,<br>Art. 5.15 L.A.<br><br>Caso núm.:<br>EVI2021G0051<br>ELA2021G0208<br>ELA2021G0209 |
|---|---|---|

Panel integrado por su presidenta, la Jueza Romero García, el Juez Bonilla Ortiz y el Juez Robles Adorno[1]

Robles Adorno, Juez Ponente.

# S E N T E N C I A

En San Juan, Puerto Rico, a 25 de febrero de 2026.

El 19 de febrero de 2025, el señor Ángel Torres Feliciano (señor Torres Feliciano o el apelante) comparece ante nos mediante la presentación de un recurso de *Apelación Criminal por derecho propio y de forma pauperis*[2], en la que solicitó que revoquemos el *Veredicto Unánime de Culpabilidad* emitido el 7 de noviembre de 2024 por el Tribunal de Primera Instancia, Sala Superior de Caguas (TPI).[3]

En el aludido dictamen, el señor Torres Feliciano fue declarado culpable por infracciones al Art. 93(a) (Asesinato en

---

[1] Véase OATA-2025-170 del 3 de septiembre de 2025 en la que se designa al Juez Robles Adorno en sustitución del Juez Pagán Ocasio.

[2] El 21 de febrero de 2025, se asignó al Lcdo. Oscar García Rivera como abogado de oficio en esta etapa apelativa, quien representó al apelante en juicio ante el Tribunal de Primera Instancia. El 10 de marzo de 2025 el Lcdo. García Rivera presentó *Solicitud de Relevo* para que este foro le relevara de la designación de oficio en esta etapa apelativa y así fue concedido por este Tribunal. Así las cosas, el 29 de marzo de 2025, el señor Torres Feliciano nos solicitó mediante *Urgente Moción*, que se asignase un abogado de oficio para esta etapa. Mediante *Resolución*, el 11 de abril de 2025, se emitió orden asignando al abogado de oficio, Lcdo. Yosu D. Amorrortu. De modo que, el apelante por conducto de su representación legal presentó *Alegato* el día 17 de diciembre de 2025.

[3] Autos Originales.

primer grado) del *Código Penal de Puerto Rico*, 33 LPRA sec. 5142, el Arts. 5.04 (Portación y uso de armas de fuego sin licencia) y 5.15 (Disparar o apuntar armas) de la derogada *Ley de Armas de Puerto Rico* (Ley Núm. 404-2000), 25 LPRA secs. 458c y 458n.[4]

Por los fundamentos que expondremos a continuación, confirmamos la *Sentencia* apelada.

## I.

Surge del expediente ante nuestra consideración que, por hechos acontecidos el 26 de julio de 2017 en el Residencial Narciso Varona del pueblo de Juncos, Puerto Rico, el Ministerio Público presentó una acusación contra el señor Torres Feliciano, por una infracción al Art. 93(a) del *Código Penal de Puerto Rico*, *supra*, y dos denuncias por violaciones a los Arts. 5.04 y 5.15 de la derogada Ley Núm. 404-2000, *supra*.[5] En particular, se le imputó haber ocasionado la muerte del Sr. Jonathan L. Zavala Rosado (Zavala Rosado), tras dispararle en varias ocasiones con un arma de fuego, la cual portaba sin licencia, de forma ilegal, voluntaria, maliciosa, a propósito y criminalmente.[6]

Luego de diversos incidentes procesales, el 14 de octubre de 2021, el TPI celebró una Vista Preliminar en la que se encontró causa probable por los delitos previamente citados.[7] Culminados los trámites de rigor, se celebró el juicio contra el señor Torres Feliciano ante un Jurado. El juicio tuvo lugar los días: 14, 15, 16 y 17 de agosto de 2023; 6, 8, 27 y 28 de noviembre de 2023 y; 6 de noviembre de 2024.[8]

---

[4] En nuestro ordenamiento, aunque la normativa vigente es la *Ley de Armas de Puerto Rico de 2020* (Ley Núm. 168-2019), 25 LPRA secs. 455, *et seq.*, la versión derogada era la que se encontraba vigente al momento de los hechos que dieron paso a las acusaciones presentadas contra el señor Torres Feliciano. No obstante, surge de la *Minuta* de la Vista para dictar Sentencia, que la Defensa argumentó sobre el principio de favorabilidad para que se dictara sentencia bajo la *Ley de Armas de Puerto Rico de 2020*, *supra*, a los efectos de que le aplicase el Art. 6.01 y así cualifique para la Junta de Libertad bajo Palabra al cumplir el 75% del término de reclusión.
[5] Autos originales, Denuncias del 8 de noviembre de 2018.
[6] *Íd.*
[7] Autos originales, Resolución Vista Preliminar.
[8] Autos originales.

La prueba presentada por el Ministerio Público durante el juicio consistió en prueba testifical, a través de las declaraciones de once (11) testigos, y diversa prueba documental y pericial. El Ministerio Público presentó los testimonios de: Sr. John D. Miranda Rivera (Miranda Rivera), Sr. Christopher Soto Rivera (Soto Rivera), Sra. María Hernández Miranda (Hernández Miranda), Sr. Merphys Rivera Alicea (Rivera Alicea), Sra. Ana A. Torres Cruz (Torres Cruz), Sra. Jacqueline Berríos Rivera (Berríos Rivera), Agte. Ismael Vázquez Vázquez (agente Vázquez Vázquez), Dra. Irma Rivera Diez (doctora Rivera Diez), Sra. María F. Rosado Ortiz (Rosado Ortiz), Agte. Marcos García (agente García), Agte. Joelis Vicente Cruz (agente Vicente Cruz).

De los once (11) testimonios, en su *Alegato*, la parte apelante solo cuestionó las declaraciones de la Sra. Rosado Ortiz (madre del occiso), el del Sr. Soto Rivera (investigador forense) y de la Sra. Berríos Rivera (perito en balística). Por esta razón, resumiremos únicamente éstos, destacando lo pertinente conforme a lo alegado por el señor Torres Feliciano. Veamos el resumen de los testimonios.

### Testigo María F. Rosado Ortiz

La señora María F. Rosado Ortiz (Rosado Ortiz o testigo) declaró que residía en el Residencial Narciso Varona en Juncos, donde había vivido por treinta y ocho (38) años.[9] Afirmó que tenía cinco (5) hijos y que el 26 de julio de 2017, a las 12:40p.m., se encontraba en la residencia de su hijo, el señor Zavala Rosado, quien tenía en ese momento veinticinco (25) años.[10] Testificó que, el señor Zavala Rosado vivía en el edificio 24, apartamento 205, junto a su esposa, la señora Cepeda, y sus dos (2) hijas, mientras que la señora Rosado Ortiz residía en el edificio 1, apartamento 3, del mismo residencial.[11] Explicó que, ese día estaba en la casa de su

---

[9] *Transcripción de Prueba Oral* (TPO), pág. 203, líneas 4-20.
[10] *Íd.*, págs. 203-204, líneas 23-31; 1-3.
[11] *Íd.*, pág. 204, líneas 4-19.

hijo, buscando unas ollas para cocinarles.[12] Entró al cuarto para cambiarle el pañal a una de las menores, y describió que las ventanas *estaban abiertas* y la cama quedaba paralela a ellas.[13] En ese momento, narró que *escucharon unas detonaciones que provenían de abajo, "del gallerín".*[14]

Consecuentemente, aseveró que <u>miró rápidamente por las ventanas, semi abiertas, hacia abajo donde está el "gallerín"</u> que "era un murito, [...] atrás para ese entonces [donde] se metían a jugar [...] gallos".[15] Entonces, *observó que estaba el señor Torres Feliciano, a quien identificó en sala, trepado en una silla disparando hacia el interior del "gallerín".*[16] Acto seguido, declaró que *vio al apelante tirarse de la silla y correr en dirección paralela hacia el edificio 26, donde lo perdió de vista.*[17]

Entonces, indicó que, *le dijo a "China", la señora Cepeda, que algo había ocurrido, y bajó hacia el "gallerín".*[18] *Luego, llegó al lugar de donde salió su hijo, el señor Zavala Rosado, muerto.*[19] Narró que, su otro hijo Anthony, junto con otra persona del mismo residencial y una joven, "sacaron a su hijo porque era fuerte y grande, y ella lo vio con la cabeza llena de sangre".[20] Así, lo trasladaron al CDT de Juncos en su vehículo, un Lancer blanco.[21] Indicó que, ella fue a cambiarse de ropa, y luego llegó al CDT, donde certificaron la muerte de su hijo a la 1:00 p.m.[22]

Declaró que, *conoce al apelante desde "hace años"* porque "mis hijos son primos de él, mi esposo, 13 años que estuvo con (Inteligible) Carrión, que era el papá de mis hijos más pequeños de

---

[12] *Íd.*, líneas 22-28.
[13] *Íd.*, pág. 205-206, líneas 13-31; 1-12.
[14] *Íd.*, págs. 206-207, líneas 22-24; 1-7.
[15] *Íd.*, pág. 207, líneas 11-19.
[16] *Íd.*, pág. 207-208, líneas 22-31; 1-6.
[17] *Íd.*, pág. 208, líneas 26-31.
[18] *Íd.*, pág. 209, líneas 12-21.
[19] *Íd.*, pág. 211, líneas 6-17.
[20] *Íd.*, págs. 211-212, líneas 23-31;1-2.
[21] *Íd.*, pág. 212, líneas 3-8.
[22] *Íd.*, líneas 15-25.

los tres (3), de Kelvin, Cristal y Yaciel. Este, son primos de él".[23] Indicó que, el señor Torres Feliciano y su familia vivían en el Residencial Narciso Varona, pero se marcharon después de los hechos.[24] Señaló que, volvió a ver al señor Torres Feliciano dos (2) días después, cuando lo observó saliendo del residencial.[25]

Ahora bien, luego que certifican la muerte de su hijo, indicó que regresó al residencial.[26] Manifestó que, le informó a la agente Joelis (agente Vicente Cruz) *"[a]hí está el asesino escondido de mi hijo. En el 26-"*. Pero que, como era peligroso, se lo dijo en una esquina más alejada, en el área de los parkings y que la agente le respondió "tranquila, no hablamos acá, hablamos al otro día en la oficina".[27] Consecuentemente, sostuvo que siguió la instrucción de la agente y al día siguiente acudió a su oficina para ofrecer una declaración.[28] Adujo que, le indicó a la agente que ella salió de su casa hacia el apartamento de su hijo, es decir, desde el Edificio 1 hacia el 24, ubicado al final del residencial, el cual describió como "[g]randísimo", con 260 apartamentos en bloques.[29] Además, le narró a la agente que en ese día, *salió a buscar unas ollas, y que en el camino vio al señor Torres Feliciano en el muro con un arma de fuego de color negra.*[30]

Se le mostró el *Exhibit* número 1, mediante el cual reconoció el residencial, el frente del Edificio 24, el "gallerín" y la ventana por la cual observó los hechos.[31] Más adelante, identificó dos (2) fotografías en la que se muestran las ventanas, las cuales se admitieron como *Exhibit* número 10-1 y 10-2, y la testigo explicó que ella se asomó por la ventana del tercer piso, específicamente por la

---

[23] *Íd.*, pág. 213, líneas 6-12.
[24] *Íd.*, líneas 15-24.
[25] *Íd.*, líneas 25-28.
[26] *Íd.*, pág. 214, líneas 24-31.
[27] *Íd.*, pág. 216, líneas 8-20.
[28] *Íd.*, líneas 21-30.
[29] *Íd.*, pág. 217, líneas 2-26.
[30] *Íd.*, págs. 218-219, líneas 8-22; 13-19.
[31] *Íd.*, págs. 220-221, líneas 4-31; 4-30.

primera y segunda ventana.[32] Respecto al *Exhibit* número 10-2, expresó que se podía apreciar el cuarto matrimonial de su hijo, la cama donde colocó a la bebé e *identificó las ventanas que tenían vista "hacia el "gallerín" completó", "se ve directamente la carreterita, [el] zafacón y el "gallerín" [...] completa..."*.[33]

Por otro lado, sostuvo que, le informó a la agente Joelis (agente Vicente Cruz) todo lo que había observado, incluyendo que vio al apelante "tirando hacia adentro".[34] Así, describió al señor Torres Feliciano, a quien conoce como blanco, "tosquito, bajito [...], un lunar grande [...], una verruga en la cara izquierda, en el cachete".[35] En cuanto a las detonaciones, narró que escuchó unas primeras detonaciones y luego un "fuletazo", refiriéndose a la rapidez.[36]

En el contrainterrogatorio, admitió que en su declaración jurada sostuvo que, a las 12:40 p.m., salía para la casa de Jonathan.[37] Precisó que su apartamento está al otro lado de la avenida del apartamento de su hijo, pero que es poca distancia, aproximadamente cinco minutos caminando.[38] Añadió que vio por primera vez al señor Torres Feliciano con un arma de fuego desde el portón entre los edificios 3 y 4, aunque no pudo precisar si habían 200 a 300 metros en distancia, ya que no sabía de metros o kilómetros, pero "de distancia, sí".[39] Ahora bien, a preguntas de la defensa, y habiendo utilizado la grabación de vista preliminar (V.P.) para refrescar memoria, la testigo aceptó que había declarado en la V.P. que estaba como de 200 a 300 metros, contando la carretera.[40] Por otra parte, esgrimió que, <u>las ventanas del cuarto estaban</u>

---

[32] *Íd.*, págs. 232-233, líneas 28-31; 4-24.
[33] *Íd.*, pág. 234, líneas 1-13.
[34] *Íd.*, págs. 234-235, líneas 17-30; 1-5.
[35] *Íd.*, pág. 236, líneas 14-23.
[36] *Íd.*, págs. 234-235, líneas 11-29; 1-13.
[37] *Íd.*, pág. 244, líneas 18-21.
[38] *Íd.*, págs. 244-245, líneas 23-31; 1-9.
[39] *Íd.*, págs. 246-247, líneas 6-31; 1-20.
[40] *Íd.*, págs. 250-251, líneas 20-30; 1-11.

abiertas, aunque admitió que en la V.P. había manifestado que las ventanas estaban semiabiertas.[41]

Luego, testificó que, vio al apelante lanzarse de la silla y correr hacia el edificio 26, sin embargo, reconoció que en la vista preliminar había indicado que no sabía a donde había corrido y que en su declaración jurada indicó "Luisin se fue a correr no sé para donde".[42] A preguntas de la defensa, indicó inicialmente que la persona estaba de lado cuando disparaba, aunque, admitió que en la vista preliminar había manifestado que la persona estaba de espalda.[43] En el redirecto, expresó que "Luisin" era el apelante, a quien identificó en sala.[44] No obstante, en el recontrainterrogatorio sostuvo que no había dado varias versiones.[45]

### Testigo Christopher Soto Rivera

El señor Christopher Soto Rivera (el señor Soto Rivera o testigo) declaró que es investigador forense en el Instituto de Ciencias Forenses (ICF) desde el 2012.[46] Indicó que, su preparación incluyó adiestramientos en fotografía, video, confección de *croquis*, toma, manejo y custodia de evidencia, armas de fuego, entre otras.[47] Explicó que, sus funciones comprenden investigar escenas de crimen, documentarlas mediante fotos y videos, entrevistar a los agentes de homicidios, evaluar las posibles piezas de evidencia, ocuparlas custodiarlas y entregarlas al ICF para que sean analizadas. Agregó que, su trabajo se documenta mediante un informe de escena, fotos y videos.[48]

Relató que, el 26 de julio de 2017 fue activado a la 1:50 p.m. para atender un caso en el Residencial Narciso Varona en Juncos.[49]

---

[41] *Íd.*, págs. 261-263, líneas 14-31; 1-31; 1-3.
[42] *Íd.*, págs. 275-277, líneas 10-31; 1-31; 1-21.
[43] *Íd.*, págs. 288 y 294, líneas 23-31; 1-15.
[44] *Íd.*, pág. 300, líneas 6-10.
[45] *Íd.*, pág. 301, líneas 13-17.
[46] *Íd.*, pág. 29, líneas 1-5.
[47] *Íd.*, líneas 6-10.
[48] *Íd.*, líneas 11-20.
[49] *Íd.*, pág. 30, líneas 1-8.

Testificó que, llegó al residencial a las 3:20 p.m., un complejo de vivienda pública de tres niveles con áreas verdes, aceras, calles, un muro y un área verde detrás del muro, donde había aparentemente un "gallerín".[50] Añadió que, ese día fungía como investigador primario, por lo que le correspondió completar la información del caso, preparar el informe, tomar medidas e identificar las piezas de evidencia en la escena.[51]

Afirmó que, la escena de este caso era dentro del residencial, detrás de un muro de concreto que era como el fin del residencial.[52] Añadió que, dibujó la escena a mano y que dicho *croquis* luego se pasó a computadora en el mismo sistema *Crimenson*.[53] El propósito del *croquis* era hacer una recreación o reconstrucción de la escena para presentarla en el juicio, plasmando el área donde se encontraba, las piezas de evidencia y medidas.[54]

Posteriormente, atestó que, fue identificada cada una de las piezas de evidencia con los conos amarillos y se le asignó un número de identificación.[55] Sostuvo que, se identificaron trece (13) piezas de evidencia.[56] Se le mostró el *Exhibit* número 1, y procedió a describir cada una de las fotografías sobre la escena y las piezas de evidencia.[57]

Luego de explicar múltiples imágenes, narró que, acudieron al hospital, una vez concluyeron el procesamiento de la escena principal, con el fin de identificar al occiso, fotografiaron sus heridas, realizaron un examen preliminar y el occiso fue trasladado al Instituto de Ciencias Forenses (ICF) para la autopsia.[58]

---

[50] *Íd.*, pág. 31, líneas 3-12.
[51] *Íd.*, líneas 13-17.
[52] *Íd.*, líneas 16-18.
[53] *Íd.*, págs. 32-33, líneas 19-31;1-7.
[54] *Íd.*, pág. 33, líneas 9-14.
[55] *Íd.*, pág. 36, líneas 13-22.
[56] *Íd.*, líneas 23-25.
[57] *Íd.*, págs. 37-40.
[58] *Íd.*, págs. 44-45, líneas 25-29;1-3.

En relación con el informe preliminar, *Exhibit* número 2, expresó que, éste refleja que se ocuparon siete (7) casquillos de bala disparados .45 y un proyectil.[59] Procedió a explicar el *croquis*, particularmente en el área del muro, señalando que, las piezas de evidencia encontradas en el interior del residencial eran las 1, 2, 3, 4 y 12.[60] Añadió que, los casquillos de bala disparados se llevaron al ICF para que fueran analizados por un balístico.[61] Además, explicó cada pieza de evidencia y detalles de la cadena de custodia.[62]

En el contrainterrogatorio, mencionó que, la fotografía número 9946 observaba un árbol frondoso que sobresalía la verja y que dicho árbol se encontraba entre la verja y el edificio número 24.[63] Asimismo, indicó que en las imágenes 9947 y 9948 se apreciaban tanto el árbol como las piezas de evidencia marcada como 1,2,3,4 y 12, mientras que en la foto 9949 se veía el edificio 24 de lejos y las "ramitas" que se extienden hacia la carretera.[64] Además, indicó que la imagen 9877 reflejaba el interior de "gallerín" y el árbol que estaba hacia la parte de atrás del edificio 24.[65] *A preguntas de la defensa, sobre si el árbol bloquea la visibilidad del edificio número 24, el testigo indicó que en la foto sí.*[66] En cuanto al *croquis*, mencionó que, aunque no estaba hecho a escala, "[r]efleja lo que estaba allí", aunque no refleja con exactitud la ubicación de los árboles".[67]

En el redirecto, aclaró que, las imágenes 9877 y 9878 correspondían a la parte posterior del muro, específicamente al área verde donde ubica el "gallerín".[68] Respecto a los árboles, explicó que el *croquis* es solo una representación ilustrativa del área verde y no

---

[59] *Íd.*, pág. 47, líneas 13-20.
[60] *Íd.*, pág. 49, líneas 6-31.
[61] *Íd.*
[62] *Íd.*, págs. 50-57.
[63] *Íd.*, págs. 61-63, líneas 15-29;1-17; 1-7.
[64] *Íd.*, pág. 63, líneas 8-26.
[65] *Íd.*, págs. 63-64, líneas 27-31;1-23.
[66] *Íd.*, pág. 64, líneas 27-31.
[67] *Íd.*, págs. 70-71, líneas 1-22; 8-18.
[68] *Íd.*, pág. 76, líneas 6-15.

refleja con exactitud su ubicación.[69] Por último, *indicó que el edificio 24 se encontraba al lado derecho del muro, que el objeto cercano eran unas sillas y que nada impedía la visibilidad de las sillas hacia dicho edificio.*[70] En el recontrainterrogatorio, manifestó que la silla no fue ocupada ni analizada.[71]

### Testigo Jacqueline Berríos Rivera

La señora Jacqueline Berríos Rivera (la señora Berríos Rivera o testigo) declaró que, se desempeñaba como examinadora de armas de fuego en el ICF, puesto en el que llevaba ocho (8) años y siete (7) meses.[72] Una vez fue calificada como perito, sostuvo que, en el caso AF17-1638 fue la responsable de analizar las piezas de evidencia sometidas.[73] Señaló que, el 14 de diciembre de 2021, el señor Rivera Alicea le entregó dicha evidencia.[74] Particularizó que, bajo la pieza 005, recibió un proyectil y sus fragmentos, identificado como E3, y bajo la pieza 006, siete (7) casquillos de bala marcados del E1 al E7.[75] Además, detalló que, bajo la pieza 004 recibió dos proyectiles y sus derivados que fueron identificados como E1 y E2.[76]

Atestiguó que, una vez recibió y marcó la evidencia, procedió a pesarla y medirla para determinar su calibre, y en el caso de los casquillos, se obtuvo la medida y se examinó con un microscopio de comparación para hacer un examen microscópico.[77] Precisó que, comparó los siete casquillos entre sí, debido a que no tenía arma de fuego, y concluyó que todos fueron disparados por una misma arma.[78] *Añadió que las marcas que deja un arma al disparar son únicas y no se repiten en otra, por lo que constituyen características*

---

[69] *Íd.*, pág. 77, líneas 6-13.
[70] *Íd.*, pág. 78, líneas 6-20.
[71] *Íd.*, líneas 24-30.
[72] *Íd.*, pág. 119, líneas 23-30.
[73] *Íd.*, pág. 121, líneas 22-31.
[74] *Íd.*, pág. 123, líneas 21-27.
[75] *Íd.*, pág. 124, líneas 1-7.
[76] *Íd.*
[77] *Íd.*, pág. 128, líneas 1-6.
[78] *Íd.*, líneas 10-17.

*individuales.*[79] También, indicó que, al analizar el proyectil de bala concluyó que era calibre .45 y que había sido disparado por un arma de fuego.[80]

Entonces, luego de identificar el Certificado de Examen, este fue admitido como Exhibit número 7.[81] Así las cosas, testificó que, los proyectiles E1 y E2 correspondientes a la pieza de evidencia 004 del caso 917-0338 no presentaban características propias de comparación, lo que significa que una vez pierde su blindaje, pues no tiene características microscópicas.[82] Mencionó que, el proyectil de bala marcado E3, correspondiente a la pieza 005 del caso AF17-1638, era calibre .45, con estriación a la derecha y R8, y fueron disparados por un arma de fuego.[83] Una vez completó el examen de todas las piezas de evidencia, estas fueron embaladas y entregadas en la sección de recibo de evidencia.[84]

En el contrainterrogatorio, indicó que, según el *Exhibit* número 7, los fragmentos que carecen de características microscópicas comparables no permiten determinar si fueron disparados por la misma arma que los demás proyectiles.[85] Sostuvo que, no podía concluir que el proyectil provenía de alguno de los siete casquillos.[86] En cuanto a la dirección en que fueron expulsados los casquillos, afirmó que no los plasmó en su informe porque "[n]o se realiza. No es parte del proceso".[87] Finalmente, afirmó que, los siete casquillos tenían la misma marca de la aguja percutora.[88]

Tras el desfile de prueba en el juicio y escuchadas las argumentaciones de las partes, el 7 de noviembre de 2024, el jurado

---

[79] *Íd.*, líneas 18-26.
[80] *Íd.*, pág. 131, líneas 23-30.
[81] *Íd.*, págs. 132-133.
[82] *Íd.*, pág. 134, líneas 10-18.
[83] *Íd.*, líneas 23-38.
[84] *Íd.*, pág. 135, líneas 8-11.
[85] *Íd.*, pág. 139, líneas 15-29.
[86] *Íd.*, pág. 141, líneas 1-18.
[87] *Íd.*, pág. 142, líneas 2-13.
[88] *Íd.*, pág. 143, líneas 1-11.

rindió un veredicto de culpabilidad de forma unánime en los siguientes delitos:

a. Art. 93(a) (1er grado) del Código Penal de 2012, *supra*, 33 LPRA sec. 5142.

b. Art. 5.04 Ley de Armas de Puerto Rico, *supra*, 25 LPRA secs. 458c.

c. Art. 5.15 de Ley de Armas de Puerto Rico, *supra*, 25 LPRA secs. 458n.

Consecuentemente, el 29 de enero de 2025, el TPI llevó a cabo el acto de pronunciamiento de sentencia en contra del señor Torres Feliciano. Las penas de cárcel a las que ésta fue condenada fueron las siguientes: noventa y nueve (99) años por infringir el Art. 93 del Código Penal, por el delito de asesinato en primer grado, veinte (20) años por al Art. 5.04 Ley de Armas de Puerto Rico, *supra*, y diez (10) años en cuanto al Art. 5.15 Ley de Armas de Puerto Rico, *supra*. Además, dispuso que las penas serían extinguidas de forma consecutiva entre sí, para un total de ciento veinte nueve (129) años de reclusión.

Inconforme con el veredicto de culpabilidad, el 19 de febrero de 2025, el apelante acudió ante este foro revisor mediante el recurso de apelación de epígrafe, en el cual planteó los siguientes señalamientos de error:

Primer error: Erró el Tribunal de Primera Instancia al sostener un veredicto de culpabilidad cuando la prueba fue insuficiente en derecho para probar, más allá de duda razonable, la identidad del autor y el nexo causal entre el Apelante y la muerte (identificación ocular físicamente imposible y prueba científica inconclusa), en violación al debido proceso de ley.

Segundo error: Erró el Tribunal de Primera Instancia al sostener una convicción por asesinato en primer grado (Art. 93(a) CP) sin prueba suficiente de premeditación o acecho, como cuestión de derecho.

Tercer error: Erró el Tribunal de Primera Instancia al admitir, y luego no remediar adecuadamente, evidencia de carácter inadmisible (Regla 404(b)) sobre supuestas "deudas" y "drogas/vicio", y al denegar la moción de mistrial, privando al Apelante de un juicio justo e imparcial.

Cuarto error: Erró el Tribunal de Primera Instancia al admitir fotografías altamente gráficas y perturbadoras del occiso y/o de la escena, en violación a la Regla 403 de Evidencia, por ser su perjuicio indebido sustancialmente mayor que su valor probatorio.

Quinto error: Erró el Tribunal de Primera Instancia al admitir evidencia física fungible (casquillos y proyectil) sin una autenticación adecuada y con quebrantos en la cadena de custodia, en violación a las Reglas 901 y 109(B) de Evidencia y al debido proceso de ley.

Luego de los correspondientes trámites apelativos, el 17 de noviembre de 2025, este Tribunal dio por estipulada la transcripción de la prueba oral. A su vez y luego de varias mociones, la parte apelante presentó su alegato el 17 de diciembre de 2025 y la Oficina del Procurador General, en representación del Pueblo de Puerto Rico, presentó el suyo el 20 de enero de 2026.

Con el beneficio de los autos originales del caso, la transcripción de la prueba oral y la comparecencia de las partes, resolvemos.

**II.**

**A.**

La Sección 11 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico, LPRA, Tomo 1, consagra la presunción de inocencia como uno de los derechos fundamentales que le asiste a toda persona acusada de cometer un delito. *Pueblo v. Negron Ramírez*, 213 DPR 895, 907 (2024). Toda persona acusada goza de la presunción de inocencia en los procesos criminales, cobijándole desde el inicio de la acción penal hasta el fallo o veredicto de culpabilidad. Es decir, todo acusado se considera "inocente" hasta que el Estado pruebe que es culpable más allá de duda razonable mediante la presentación de prueba suficiente y satisfactoria sobre cada uno de los elementos del delito y su conexión con el acusado. *Pueblo v. Irizarry Irizarry*, 156 DPR 780, 787-788 (2002). Así reconocido, en los procesos judiciales penales, se entiende que el Estado es quien tiene el peso de la prueba. *Pueblo*

*v. Toro Martínez,* 200 DPR 834, 856 (2018); *Pueblo v. García Colón I,* 182 DPR 129, 174 (2011). Dicha presunción también forma parte de las Reglas 110 y 304 de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 110 y 304.

Dicho esto, la Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R. 110, establece que, "[e]n todo proceso criminal, se presumirá inocente al acusado mientras no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad,se le absolverá". Como vemos, conforme a nuestro ordenamiento jurídico, el acusado no tendrá obligación alguna de aportar prueba para defenderse y podrá descansar plenamente en la presunción de inocencia que le cobija. *Pueblo v. Irizarry Irizarry, supra,* pág. 787.

El juzgador de hechos vendrá llamado a evaluar y aquilatar la evidencia presentada ante sí para determinar cuáles hechos han quedado probados o establecidos. Regla 110 de Evidencia, *supra.* En casos criminales con derecho a juicio por Jurado, esta función le corresponde al Jurado, el cual está constitucionalmente encomendado a recibir la prueba, adjudicar los hechos en base a ésta y aplicar el derecho según le instruya el tribunal. *Pueblo v. Negron Ramírez, supra,* págs. 908-909; *Pueblo v. Santa Vélez,* 177 DPR 61, 65-66 (2009)

No obstante, tal estándar de exigencia probatoria no significa que el Estado tenga que presentar prueba que establezca la culpabilidad del acusado con certeza matemática. *Pueblo v. Negron Ramírez, supra,* pág. 907. La prueba sobre la culpabilidad del acusado es satisfactoria cuando produce certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Pueblo v. Negron Ramírez, supra,* pág. 908.

En cuanto a la duda razonable que acarrea la absolución del acusado, no es una duda especulativa o imaginaria, ni cualquier duda posible. *Pueblo v. Irizarry Irizarry, supra,* pág. 788. Más bien,

se trata de aquella duda que es producto de una consideración serena, justa e imparcial de la totalidad de la evidencia del caso. *Íd.* Es decir, existe duda razonable cuando el juzgador de los hechos siente en su conciencia insatisfacción o intranquilidad con la prueba. *Pueblo v. García Colón I, supra*, pág. 175.

Con lo anterior expuesto, como cuestión de derecho, la determinación sobre si se probó la culpabilidad del acusado más allá de duda razonable es revisable en apelación, toda vez que, "la apreciación de la prueba desfilada en un juicio es un asunto combinado de hecho y derecho". *Pueblo v. Irizarry Irizarry, supra*; *Pueblo* v. *Rivero, Lugo y Almodóvar*, 121 DPR 454, 472 (1988).

**B.**

El derecho a juicio por jurado se encuentra consagrado expresamente en la Sexta Enmienda de la Constitución de los Estados Unidos de América. La referida enmienda dispuso lo siguiente:

> **En todas las causas criminales, el acusado gozará del derecho a un juicio rápido y público, ante un jurado imparcial del estado y distrito en que el delito haya sido cometido, distrito que será previamente fijado por ley**; a ser informado de la naturaleza y causa de la acusación; a carearse con los testigos en su contra; a que se adopten medidas compulsivas para la comparecencia de los testigos que cite a su favor y a la asistencia de abogado para su defensa. (Énfasis suplido). Emda. VI, Const. EE.UU., LPRA, Tomo 1, ed. 2016, pág. 198.

Como corolario de lo anterior y dada nuestra relación con los Estados Unidos, el derecho a juicio por jurado, para los acusados de delitos graves, también se encuentra consagrado en la Carta de Derechos de la Constitución de Puerto Rico. Art. II, Sec. 11, Const. ELA, LPRA, Tomo 1, ed. 2016, pág. 354. De tal manera, en Puerto Rico se reconoce bajo rango constitucional, el derecho a juicio por jurado, cuyo objetivo fundamental es garantizar que doce (12) vecinos imparciales-libres de influencias extrañas-residentes del distrito judicial correspondiente al lugar donde

alegadamente ocurrieron los hechos imputados, sean los juzgadores. *Pueblo v. Sánchez Pérez,* 122 DPR 606, 609 (1988). Además, este derecho de estirpe constitucional fue reconocido por la Regla 112 de las de Procedimiento Criminal, *supra,* R.112, la cual estableció que: "[e]l jurado estará compuesto por doce (12) vecinos del distrito, quienes podrán rendir veredicto por mayoría de votos...".

Ahora bien, con la Opinión emitida por la Corte Suprema Federal, en el caso *Ramos v. Louisiana,* 590 US (2020), el Máximo Foro Federal concluyó que la unanimidad del veredicto es un requisito fundamental en los juicios por jurado celebrados en casos criminales. Así pues, el Tribunal Supremo de Puerto Rico acogió la doctrina y razonó que se trataba de un derecho fundamental, aplicable "en toda su extensión a Puerto Rico". *Pueblo v. Torres Rivera,* 204 DPR 288, 304 (2020). De modo que, nuestro Máximo Foro reconoció que la unanimidad del veredicto constituye una protección procesal esencial adicional que se deriva del derecho fundamental a un juicio por jurado consagrado en la Sexta Enmienda de la Constitución Federal.

**C**.

El Art. 92 del Código Penal, 33 LPRA sec. 5141, establece que, "asesinato es dar muerte a un ser humano a propósito, con conocimiento o temerariamente". En esa línea, el Art. 93(a) del Código Penal, supra sec. 5142, dispone que, "todo asesinato perpetrado por medio de veneno, acecho, tortura, estrangulamiento, sofocación o asfixie posicional, o a propósito o con conocimiento". El delito de asesinato se trata como un solo delito, pero dividido en varios grados. *Pueblo v. Roche,* 195 DPR 791, 797 (2016). Asesinato en primer grado es toda muerte causada a propósito o con conocimiento. D. Nevares-Muñiz, *Código Penal de Puerto Rico Comentado,* Ed. Instituto para el Desarrollo del Derecho, Inc., 2019,

pág. 149. Quien asesina a propósito tiene el objetivo consciente de causar la muerte de la víctima; mientras que mata con el estado mental de conocimiento quien sabe que la muerte es una consecuencia prácticamente segura de su conducta. *Íd.*, pág. 155. En *Pueblo v. Rodríguez Pagán*, 182 DPR 239 (2011), citando a *Pueblo v. Rodríguez Vicente*, 173 DPR 292 (2008), nuestro Tribunal Supremo explicó que el asesinato es un delito cometido intencionalmente. En específico, lo definió como "un delito que, por su definición y naturaleza, conlleva un acto perverso, malintencionado y contrario a los valores éticos y morales de nuestra sociedad". *Pueblo v. Rodríguez Vicente, supra,* pág. 301. En *Pueblo v. Rodríguez Pagán, supra,* el Tribunal Supremo aclaró que el asesinato en primer grado requiere que la persona tenga un deseo específico de efectuar el acto y quiera producir el resultado, ratificándolo con su actuación.

En lo pertinente, en un juicio por jurado, el tribunal debe impartir instrucciones haciendo un resumen de la evidencia y explicando los asuntos relacionados a derecho importantes para la información del jurado. Regla 137 de Procedimiento Criminal, 34 LPRA Ap. II; *Pueblo v. Colón González*, 209 DPR 967, 987 (2022). Las instrucciones deben ser correctas, claras, precisas y lógicas. *Pueblo v. Ortiz Martínez*, 116 DPR 139 (1984). El manual de instrucciones al jurado constituye una buena práctica con tal de minimizar las posibilidades de error en las instrucciones al jurado y lograr uniformidad. *Pueblo v. Colón González, supra*, pág. 987-988, citando a *Pueblo v. Echevarría Rodríguez I*, 128 DPR 299, 343 (1991). Dichas instrucciones tienen una presunción de corrección y quien las impugne debe demostrar que la instrucción es errónea. Pueblo v. Ortiz González, 111 DPR 408, 410 (1981); *Pueblo v. Colón González, supra*, pág. 988.

**D.**

Para que una evidencia sea admisible debe cumplir con los requisitos que estatuyen las Reglas de Evidencia, 32 LPRA Ap. II. En primer lugar, toda evidencia debe ser pertinente. Regla 401 de Evidencia, *supra*, R. 401. La pertinencia es "toda aquella que haga más o menos probable la existencia de un hecho que tiene consecuencias hecho que tiene consecuencias para la adjudicación de la acción, incluyendo aquella evidencia que sirva para impugnar o sostener la credibilidad de una persona o un testigo declarante. Si la evidencia no es pertinente, el análisis termina ahí, pues esta no será admisible en nuestros tribunales. *Rosado Reyes v. Global Healthcae Group, LLC*, 205 DPR 796, 812 (2022). En segundo lugar, una vez la prueba es considerada pertinente, tiene que cumplir con el requisito de autenticación. *Rosado Reyes v. Global Healthcae Group, LLC*, *supra*, pág. 812, citando a: *Rivera Menéndez v. Action Service*, 185 DPR 431 (2012). Autenticar conlleva demostrar que la cosa es lo que se propone que es. *Rosado Reyes v. Global Healthcae Group, LLC*, *supra*, pág. 812. La autenticación de la evidencia es "la presentación de evidencia suficiente para sostener una determinación de que la materia en cuestión es lo que la persona proponente sostiene". Regla 901 de Evidencia, *supra*, R. 901. De un juzgador estimar que se presentó evidencia suficiente para autenticar el objeto y decide admitir la evidencia, dicha determinación "no deberá ser alterada en apelación a menos que haya un abuso de discreción." *Pueblo v. Echevarría Rodríguez I, supra*, pág. 350.

Ahora bien, una vez sea debidamente autenticada, la evidencia será admisible, a no ser que el Tribunal la excluya en virtud de la Regla 403 de Evidencia, *supra*, R. 403 o que opere alguna regla de exclusión de las Reglas de Evidencia, *supra*. La Regla 403 de Evidencia, *supra*, R. 403 dispone que,

> Evidencia pertinente puede ser excluida cuando su valor probatorio queda sustancialmente superado por cualesquiera de estos factores:
> (a) riesgo de causar perjuicio indebido
> (b) riesgo de causar confusión
> (c) riesgo de causar desorientación del Jurado
> (d) dilación indebida de los procedimientos
> (e) innecesaria presentación de prueba acumulativa.

Acerca del perjuicio indebido, el Tribunal Supremo ha aclarado que "toda prueba es 'perjudicial' en la medida que favorece a una parte y perjudica a otra, pero éste no es el tipo de perjuicio al que se refiere la regla". *Pueblo v. Santiago Irizarry, supra*, pág. 44, citando a: *Pueblo v. Ortiz Pérez*, 123 DPR 216, 228 (1989). El perjuicio indebido al que hace referencia la citada regla es sobre una prueba que puede conducir a un resultado erróneo porque se presentó con el propósito de crear pasión y perjuicio en el jurado. *Pueblo v. Santiago Irizarry, supra*, pág. 45.

En atención a la controversia ante nos, la Regla 404 (b) de Evidencia, *supra*, R. 404 (b), no se versa sobre el tipo de acto, sino el propósito para el cual el Estado pretende presentarlo. *Pueblo v. Serrano Morales*, 201 DPR 454, 467 (2018). En *Pueblo v. Serrano Morales, supra*, pág. 467, el Tribunal Supremo interpretó que,

> Por el contrario, la regla lo que hace es abrir la oportunidad al Estado, en contra de los intereses del acusado, *467 de que se pueda presentar en su contra actos específicos, aunque sean condenas previas. Esto, siempre y cuando tal prueba sea pertinente a los propósitos que, como excepción, establece la propia regla, y que el valor probatorio del acto o de la conducta específica que se pretende presentar como evidencia supere o sobrepase cualquier otro efecto perjudicial. De cumplirse con lo anterior, la conducta específica, aun cuando sea una condena anterior es admisible y no aplica la doctrina de impedimento colateral de la Cláusula de Doble Exposición.

Para determinar si procede presentar evidencia de conducta específica, la comisión de otros delitos, daño civil u otros actos, lo primordial es que el juez determine si un jurado razonable podría creer tal conducta. *Pueblo v. Serrano Morales, supra*, pág. 465.

**E.**

Es norma reiterada que, los foros apelativos debemos otorgar gran deferencia a las determinaciones de hechos, la apreciación de la prueba testifical y las adjudicaciones de credibilidad que hacen los tribunales de primera instancia. *SLG Fernández-Bernal v. RAD-MAN et al.*, 208 DPR 310, 338 (2021); *SLG Torres-Matundan v. Centro Patología*, 193 DPR 920, 933 (2015). Bajo el crisol doctrinario, los jueces del TPI están en mejor posición para aquilatar la prueba testifical porque tienen la oportunidad de oír, ver y apreciar el comportamiento del testigo. *Penna Rivera v. Pacheco Caraballo*, 213 DPR 1009, 1025 (2024); *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 779 (2022); *Meléndez Vega v. El Vocero de PR*, 189 DPR 123, 142 (2013).

De modo que, el Tribunal Supremo ha expresado: "[l]a intervención con la evaluación de la prueba testifical procedería en casos en los que luego de un análisis integral de la prueba, nos cause una insatisfacción o intranquilidad de conciencia tal que estremezca nuestro sentido básico de justicia". *Rosado Muñoz v. Acevedo* Marrero, 196 DPR 884, 917-918 (2016). Por tanto, "[c]uando la evidencia directa de un testigo le merece entero crédito al juzgador de hechos, ello es prueba suficiente de cualquier hecho". *Rivera Menéndez v. Action Service*, 185 DPR 431, 444 (2012).

A la luz de lo anterior, el foro apelativo no deberá intervenir con las determinaciones de hechos, con la adjudicación de credibilidad realizada por los foros primarios, ni con el ejercicio de su discreción, salvo que haya mediado pasión, prejuicio, parcialidad o error manifiesto. *W.M.M. P.F.M., et al v. Colegio et al.*, 211 DPR 871, 903 (2023). Por lo que, en ausencia de pasión, prejuicio, parcialidad o error manifiesto, el foro apelativo estará imposibilitado de intervenir con la apreciación de la prueba y las determinaciones de los tribunales de instancia. En cuanto al prejuicio, pasión o parcialidad, existen si el juzgador "actúa movido por inclinaciones

personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna". *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 770-771 (2013).

En cambio, el foro intermedio podrá intervenir con la apreciación de la prueba cuando de una evaluación minuciosa surjan "serias dudas, razonables y fundadas, sobre la culpabilidad del acusado". *Pueblo v. Santiago, et al.,* 176 DPR 133, 148 (2009). A tenor con lo anterior, si luego de que se realiza un análisis ponderado sobre la prueba desfilada, se sostiene que existe duda razonable y fundada sobre si se probó la culpabilidad del acusado más allá de duda razonable, este Tribunal deberá dejar sin efecto el fallo o veredicto condenatorio emitido por el foro de primera instancia. Es decir, en los casos de naturaleza criminal, no tendremos esa deferencia si: (1) hubo prejuicio, parcialidad o pasión, o (2) la prueba no concuerda con la realidad fáctica, es increíble o imposible. *Pueblo v. Resto Laureano,* 206 DPR 963, 968 (2021).

Conforme con estos principios, la determinación de culpabilidad que realiza el foro de primera instancia estará cobijada por una presunción de corrección y regularidad y, por ende, es merecedora de gran deferencia por parte de este Tribunal. *Pueblo v. Cabán Torres,* 117 DPR 645, 653-654 (1986).

**III.**

En su primer señalamiento de error, el señor Torres Felicano alegó que, incidió el TPI al sostener un veredicto de culpabilidad, toda vez que, la prueba fue insuficiente en derecho para probar, más allá de duda razonable, la identidad del autor y el nexo causal entre el apelante y la muerte del señor Zavala Rosado.

En su *Alegato,* el apelante señaló que, la única identificación hacia su persona, como autor de los hechos delictivos, provino de la

señora Rosado Ortiz. Argumentó que, su testimonio fue frágil ya que la testigo no vio a quien se le disparaba, no observó el inicio del suceso, sino que su observación tuvo lugar, luego de escuchar unas detonaciones. Además, adujo que, el investigador forense, el señor Soto Rivera, admitió que, un árbol frondoso obstruía la visibilidad, según la fotografía presentada, lo cual mina la oportunidad real de observación que tuviera la señora Rosado Ortiz. Asimismo, planteó que, la perito en balística, la señora Berríos Rivera, admitió que, no podía conectar el proyectil mortal con los casquillos ocupados, ni determinar si provenían de la misma arma. Veamos.

Conforme las normas jurídicas pormenorizadas, el testimonio de un solo testigo, que le merezca entera credibilidad al juzgador de los hechos, es prueba suficiente para demostrar la culpabilidad de un acusado, más allá de duda razonable y derrotar, así, la presunción de inocencia. *Pueblo v. de Jesús Mercado*, 188 DPR 467, 476 (2013) (citando *Pueblo v. Chévere Heredia*, 139 DPR 1, 15-16 (1995). De modo que, la prueba indirecta o circunstancial, la cual se basa en una inferencia razonable, es tan suficiente como la prueba directa, o, dicho de otro modo, intrínsecamente igual para probar cualquier hecho adjudicativo, incluso, en casos penales. *Pueblo v. Pagán, Ortiz*, 130 DPR 470 (1992).

Por otro lado, el Tribunal Supremo ha expresado que, no existe un "testimonio perfecto". *Pueblo v. Cabán Torres*, *supra*, pág. 656. En ese sentido, un testimonio seria altamente sospechoso cuando es producto de la fabricación. *Íd*. No obstante, cuando un testigo se contradice, lo que se pone en juego es su credibilidad. En ese sentido, los conflictos de un testimonio son dirimidos por el jurado o el juez del TPI, y solo procede alterar el valor, la credibilidad y la determinación ante la demostración de circunstancias extraordinarias. *Pueblo v. Torres Rivera*, 137 DPR 630, 640 (1994).

En el caso de autos, el apelante cuestiona la credibilidad de la señora Rosado Ortiz por razón de ciertas discrepancias al referirse a que las ventanas, desde donde observó al apelante estaban abiertas o semiabiertas; sobre el no recordar su testimonio en V.P. sobre la distancia en metros, desde donde observó por primera vez al apelante con un arma, y; respecto a que lo había visto disparando el arma hacia el "gallerín" de espalda y/o de lado. Empero, denotamos que, el Ministerio Público logró rehabilitar a la testigo, ante las posibles contradicciones entre un testimonio y el otro. Además, la testigo fue clara y detallada en manifestar las circunstancias que rodearon la identificación del apelante como el autor del asesinato del señor Zavala Rosado.

El Tribunal Supremo ha reiterado los factores principales que se deben evaluar para determinar la confiabilidad de la identificación, esto es:

> La oportunidad que tuvo el testigo de observar al ofensor al tiempo en que cometía el crimen, el grado de atención del testigo, la corrección de la descripción previa del criminal por el testigo, el nivel de certeza demostrado por el testigo en la confrontación, y el tiempo transcurrido entre el crimen y la confrontación. *Peterson Pieterz*, 107 DPR 172, 183 (1978).

De la prueba oral vertida en el juicio se desprende que la señora Rosado Ortiz tenía visibilidad completa hacia el "gallerín" al momento de los hechos. Entonces, se asomó por las ventanas al escuchar unas detonaciones, y observó al apelante trepado en una silla disparando hacia el interior del "gallerín" (de donde salió el señor Zavala Rosado muerto), y luego lo observó salir corriendo. Cabe señalar, que la testigo conoce al apelante de hace años. *Véase*, TPO, pág. 213, líneas 6-12. Además, narró que, poco antes de lo ocurrido, había observado al apelante en un muro, portando un arma de fuego color negra.

Su testimonio, al igual que los demás testimonios cuestionados, fueron objeto de escrutinio por el Jurado, quienes

adjudicaron la credibilidad de estos. Tal determinación en ausencia de prejuicio, parcialidad, pasión o error manifiesto merece nuestra deferencia. En ausencia de dichos elementos, no hay razón para que este Tribunal intervenga con la adjudicación de credibilidad hecha por el Jurado. El Pueblo demostró más allá de duda razonable que el señor Torres Feliciano portaba un arma de fuego sin licencia y que, con esta, disparó en múltiples ocasiones, causándole varias heridas al señor Zavala Rosado.

Con respecto al segundo error, el apelante sostuvo que, erró el TPI al sostener una convicción por asesinato en primer grado sin prueba suficiente de premeditación o acecho, como cuestión de derecho.

Tal como esbozamos en nuestra segunda parte, se configuran los elementos del delito de asesinato es "dar muerte a una persona a propósito, con conocimiento o temerariamente". Art. 92 del Código Penal, *supra* sec. 5141. En esa línea, el asesinato en primer grado incluye todo asesinato perpetrado a propósito o con conocimiento.

Ahora bien, ante un planteamiento sobre insuficiencia de prueba, la función revisora apelativa "consiste en evaluar si la evidencia admitida cumplió con el estándar probatorio de establecer la culpabilidad del acusado más allá de duda razonable". *Pueblo v. Negrón Ramírez, supra*, pág. 935. Ahora bien, cuando el reclamo es atinente a la apreciación de la prueba, lo que se impugna es la valorización, la credibilidad o el aquilatamiento que el juzgador de los hechos adjudicó a la prueba desfilada durante el juicio. *Íd.*

En vista de lo anterior, los tribunales apelativos no debemos intervenir, de ordinario, con la apreciación y la adjudicación de credibilidad realizada por el Tribunal de Primera Instancia, en relación con la prueba testifical. Similar al primer planteamiento de error, no hay razón para que este Tribunal intervenga con la adjudicación de credibilidad que hizo dicho tribunal. En el presente

caso, el Ministerio Público desfiló prueba suficiente sobre los elementos del delito, asesinato en primer grado, por el cual fue encontrado culpable el apelante. Consecuentemente, resolvemos que el Ministerio Público presentó prueba suficiente para que el foro a quo determinara que el apelante infringió el Art. 93 (a) del Código Penal, *supra* sec. 5142.

En torno al tercer señalamiento de error, el apelante alegó que el TPI erró tras admitir y no remediar adecuadamente, evidencia de carácter inadmisible (Regla 404(b)) sobre supuestas "deudas" y "drogas/vicio", y al denegar la moción de *mistrial*, privando al Apelante de un juicio justo e imparcial.

De la prueba oral vertida en el juicio, se desprende que, luego de su testimonio, la señora Rosado Ortiz hizo unas expresiones de carácter inadmisible, en clara contravención a las instrucciones impartidas por el Juez. *Véase*, TPO, págs. 301-302. Aunque ciertamente, la testigo pudo haber hecho unas expresiones contrarias a las órdenes del Tribunal, tales expresiones no son constitutivas para que se declarase un *mistrial* como argumenta el apelante. Ante lo ocurrido, el Tribunal intervino oportunamente, e impartió instrucciones claras al Jurado, evitando así cualquier tipo de error, perjuicio o parcialidad en el veredicto. Por tanto, atisbamos que no procede lo planteado por el apelante.

Por otra parte, el apelante adujo que el TPI erró al admitir fotografías altamente gráficas y perturbadoras del occiso y/o de la escena, en violación a la Regla 403 de Evidencia, por ser su perjuicio indebido sustancialmente mayor que su valor probatorio. En el presente caso, el Ministerio Público presentó fotografías de las heridas del occiso con el propósito de ilustrar su ubicación, que fueron causadas por impactos de bala, así como evidenciar la distancia de los disparos, entre otros propósitos con valor probatorio significativo, no perjudiciales. "[E]l mero hecho de que una fotografía

pueda impresionar desfavorablemente al Jurado no justifica su exclusión". *Pueblo v. Echevarria Rodríguez,* 128 DPR 299, 351-352 (1991). Asimismo, el Tribunal Supremo ha expresado que, la manera más eficaz para no impresionar adversamente a un jurado es no cometer un crimen. *Pueblo v. Ortiz Rodríguez,* 103 DPR 368, 372 (1975). Así pues, evaluada la prueba ante nos, resolvemos que, dichas fotografías no ocasionaron un perjuicio indebido que lacerara o alterara el resultado en el dictamen emitido. Es decir, las fotografías admitidas en evidencia no iban a ocasionar que el apelante no fuese declarado culpable de cometer los delitos de los cuales fue iniciado un proceso judicial en su contra.

Por último, respecto al quinto error, la parte apelante cuestiona la admisión de evidencia física fungible (casquillos y proyectil) sin una autenticación adecuada y con quebrantos en la cadena de custodia, en violación a las Reglas 901 y 109(B) de Evidencia y al debido proceso de ley.

Es sabido que, previo a que una prueba sea admisible esta debe ser pertinente a la controversia que el juzgador tiene ante sí. Luego, la parte que presente la evidencia debe autenticar la prueba en aras de satisfacer el requisito de que se presente evidencia "suficiente para sostener una determinación de que la materia en cuestión es lo que la persona proponente sostiene". Regla 901 de Evidencia, *supra,* R. 901. Una vez superado los requisitos esbozados previamente, entonces el juzgador admite la evidencia, salvo que medie alguna regla de exclusión de evidencia.

Tras haber examinado detalladamente la transcripción de la prueba oral del juicio en su fondo, resolvemos que tal error no se cometió. La cadena de custodia de las piezas de evidencia mencionadas por el apelante fue debidamente presentada para efectos de autenticación y admisión. En particular, el Ministerio Público pasó la prueba requerida sobre la autenticidad de la

evidencia admitida por el foro de instancia. Por ende, el Ministerio Público cumplió a cabalidad en presentar prueba pertinente y suficiente que autenticara la prueba y, por tanto, fuera admisible en el juicio.

Evaluada la totalidad de la prueba, se confirma el *Veredicto Unánime de Culpabilidad.* Por tal razón, colegimos que la prueba desfilada es suficiente para sostener las convicciones más allá de duda razonable. Por lo anterior, no existe razón por la cual debamos modificar la apreciación de la prueba hecha por el Jurado en el foro primario.

A la luz de lo anteriormente expuesto, concluimos que el TPI no cometió los errores señalados por la parte apelante y, por tanto, procede que confirmemos la *Sentencia* apelada.

**IV**.

Por los fundamentos antes expuestos, confirmamos la *Sentencia* apelada.

Notifíquese.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones